Filed 5/26/16

# IN THE SUPREME COURT OF CALIFORNIA

| | | |
|---|---|---|
| THE PEOPLE, | ) | |
| | ) | |
| Plaintiff and Respondent, | ) | |
| | ) | S077524 |
| v. | ) | |
| | ) | |
| MAGDALENO SALAZAR, | ) | |
| | ) | Los Angeles County |
| Defendant and Appellant. | ) | Super. Ct. No. BA081564 |
| _____ | ) | |

A jury convicted defendant Magdaleno Salazar of the first degree murder of Enrique Guevara, with personal use of a firearm.[1] Defendant admitted the truth of a special circumstance allegation that he had a prior murder conviction. After a penalty trial, the jury returned a verdict of death, and the court imposed that sentence. We affirm the judgment in its entirety.

## I. FACTS

### A. *Guilt Phase*

#### 1. *Prosecution*

Around 2:30 a.m. on July 25, 1993, Kathy Mendez and her friend Cynthia Bonilla were at a Jack in the Box restaurant. They met defendant, whom Mendez

---

[1] Penal Code sections 187, subdivision (a) and 12022.5, subdivision (a). Further unspecified statutory references are to the Penal Code.

 The jury also made a finding under section 12022, subdivision (a)(1) that a principal was armed with a firearm when the murder was committed.

SEE CONCURRING OPINION

knew as "Toy," and Enrique Echeverria, whom she knew as "Rascal." Mendez, defendant, and Echeverria were all members of the Harpys gang, based in southwest Los Angeles. Defendant drove the four of them to another restaurant, the Yoshinoya Beef Bowl, at the corner of Figueroa and 30th Streets. The Beef Bowl was on the fringe of Harpys territory, and was sometimes frequented by members of other gangs.

Mendez, defendant, and Echeverria were the only Harpys gang members present in the Beef Bowl. Defendant was wearing a white shirt and Echeverria a black one. Mendez heard the men say they needed to "take care of the neighborhood," and should not be "caught slipping." This meant they intended to control the Beef Bowl as gang territory, and not be caught unaware by rival gang members.

Two other customers testified that they were approached in the Beef Bowl that night and "hit up" by gang members asking where they were from, a way of seeking their gang identification. Arnold Lemus said he was eating with two friends when "some guys came over and they hit us up." The man doing the talking was wearing a white shirt. Lemus told him that he and his friends were a "party crew," meaning a group that hung out together and went to parties. The man in the white shirt "thr[ew] out" the name "Harpys," to which Lemus responded "it was cool, because I didn't have nothing against nobody like that." Juan Salazar, one of Lemus's companions, had difficulty remembering on the witness stand. In a statement to police at the time of the events, he had said that one of the people who approached them was wearing a white shirt and looked like a gang member. At trial, he recalled only that one of the men "hit [Lemus] up," asking "where we from," meaning "what neighborhood are you from, what gang."

While Mendez waited in a line of customers, defendant and Echeverria left the restaurant and stood just outside. As the door opened, Mendez heard

2

defendant tell Echeverria to get the "cuete," a slang term for a gun. Echeverria retrieved something from the car and put it in his waistband. Mendez then saw a man walk past the Beef Bowl. He was shirtless, had a cast on his leg, and to Mendez he looked like a gang member. Defendant and Echeverria confronted this man in front of the Beef Bowl and began wrestling with him. The front of the restaurant was glass from floor to ceiling. Mendez heard gunshots, and saw defendant shooting in the direction of the café next door, the Au Rendezvous. She threw herself to the floor. There were "a lot of shots," maybe eight or nine.

When the shooting stopped, Mendez went outside. Defendant was half-carrying Echeverria toward the car. Drops of blood marked their path. Defendant was holding what looked like a 9 millimeter pistol. He helped Echeverria into the car and drove away. Mendez went into the Au Rendezvous, where the man with the cast on his leg was lying face down. There was a lot of blood.

Emilio Antelo was the Beef Bowl security guard. He was standing outside, between the Beef Bowl and the Au Rendezvous, when a car pulled up and parked. A teenaged passenger got out and entered the Beef Bowl. As the driver approached, Antelo prepared to stop him because Beef Bowl policy required customers to wear shirts. Antelo then heard a "metallic sound," turned, and saw a man cocking a pistol. The gunman walked past Antelo and toward the shirtless man. Antelo heard another pistol being cocked, and saw a second gunman approach the shirtless man, who appeared to be unarmed. Both guns were semiautomatic pistols. All three men were Hispanic. The gunmen said something to the other man, which Antelo could not understand. Antelo went inside the Beef Bowl, and heard gunfire. When the shooting stopped, he told the cook to call the police, went outside, and saw the shirtless man on the ground.

A third eyewitness, Patrick Turner, was walking past the Beef Bowl on his way to the Au Rendezvous. Turner had great difficulty recalling the events; most

3

of his testimony was reconstructed from his statement to police at the scene.  He saw a small car drive up and park.  The passenger went into the Beef Bowl, but the driver was confronted by two men, one wearing a white shirt and the other a black one.  They asked him, "don't I know you from somewhere?"  The three began "arguing and scuffling."  They wrestled with each other, moving into the Au Rendezvous.  The man in the black shirt stood in the doorway shooting.  He and the man in white, who was limping, then went to a car and drove off.  The black-shirted man was in the driver's seat.

The victim was Enrique Guevara.  His cousin, Giovanni Guevara, was with him on the night of the shooting but had succumbed to a fatal disease by the time of trial.  The parties stipulated that Giovanni would have testified as follows: When he and his cousin went to the Beef Bowl, Enrique was not wearing a shirt and had a cast on his leg.  Enrique parked the car in front of the Au Rendezvous.  As Giovanni entered the Beef Bowl, he saw "two gangster-looking guys." Moments later he heard gunshots, but did not see who was shooting.  He was told his cousin had been shot to death.

Sabino Nungaray, a Harpys gang member, testified that around 3:00 on the morning in question, defendant knocked on his door and told him that Echeverria had been shot.  Nungaray went with them to a hospital.  As he helped Echeverria into the building, defendant drove away.

Fifteen bullet casings were recovered, both inside and outside the Au Rendezvous.  Twelve were 9 millimeter, fired from the same gun, and three were .25 caliber, fired from another weapon.  Guevara had been shot nine times, in the chest, the back, the tops of both shoulders, the back of the head, the neck, the back of the upper arm, the forearm, and the hand.  There was no soot or stippling around the wounds, indicating that they were inflicted from a distance of greater

4

than two feet. Three of the bullet fragments recovered from Guevara's body were from a 9 millimeter weapon. Six others could not be assigned a caliber.

### 2. *Defense*

Echeverria testified for the defense. He told the jury that he had shot and killed Guevara, had been convicted of the killing, and was currently in prison. He said he and defendant were standing outside the Beef Bowl when a car drove by. The occupants were "staring us down" and "looked like gang-bangers." Echeverria went to his car, retrieved a 9 millimeter automatic, cocked it, and placed it in his waistband. The other car parked, and the passenger went into the Beef Bowl. Defendant followed him inside. The driver emerged, shirtless, and appeared to be "under the influence." He produced a .25 caliber automatic and said something to Echeverria including the word "Trece," which Echeverria took as a gang reference. Then the man began shooting.

Echeverria said he was shot three times. As he reached for his gun, his assailant came closer and shot him three more times. Echeverria grappled with the man and fired all 14 rounds in his clip as the two wrestled. Echeverria fell on top of his attacker in the Au Rendezvous. Defendant appeared and helped him to the car. Echeverria had dropped his gun, which defendant retrieved. Defendant drove to Nungaray's house, then to the hospital.

A defense investigator testified that during an interview in the prosecutor's office shortly before trial, Kathy Mendez had said she did not actually see anyone firing a gun. Someone else had told her who was shooting. On cross-examination, the investigator acknowledged that Mendez said this before she was able to review her earlier statements. Mendez then acknowledged that her memory of the events had been better when she gave those statements.

The parties stipulated that Guevara had gunshot residue particles on his hands. Defendant admitted the special circumstance allegation that he had a prior conviction of first degree murder.

B. *Penalty Phase*

1. *Prosecution*

The deputy district attorney who prosecuted defendant for the prior murder testified about the circumstances of that crime. Defendant and two fellow Harpys were visiting friends when they saw a neighbor leave the apartment building. Believing he might be a drug dealer who had money, they decided to rob him when he returned. The victim was shot and killed in the hallway. The theory of the prosecution was that defendant was an aider and abettor, not the shooter.

Guevara's mother and sister testified about the impact his death had on them.

2. *Defense*

Defendant's mother and sister, and a longtime friend, testified on his behalf. His family spoke about his affectionate nature, and their attempts to keep him from associating with gang members. Defendant's friend said he had counseled her to stay away from gangs, and helped change her life.

## II. DISCUSSION

A. *Pretrial Issues*

1. *Use of Juvenile Murder Conviction as a Special Circumstance*

Defendant was 17 years old when he committed the prior murder, but was tried and convicted as an adult. He contends the Eighth Amendment barred the prosecution from alleging that conviction as a special circumstance, because he was a juvenile at the time of the crime. Defendant concedes in his opening brief that prior violent conduct by a juvenile, including murder, is properly considered at the penalty phase as an aggravating circumstance. (*People v. Bivert* (2011) 52

6

Cal.4th 96, 122-123 (*Bivert*), and cases therein cited.)[2]  However, he notes that the special circumstance provided by section 190.2, subdivision (a)(2) is different from the aggravating factor provided by section 190.3, factor (b).  The special circumstance serves the narrowing function of determining *eligibility* for the death penalty, whereas the aggravating factor allows consideration of prior criminal activity as part of an individualized penalty determination.  (*People v. Bacigalupo* (1993) 6 Cal.4th 457, 468-469.)

Defendant asks us to apply the Eighth Amendment's ban on imposing the death penalty for crimes committed by juveniles, established in *Roper v. Simmons* (2005) 543 U.S. 551, to preclude the state from seeking the death penalty "solely on the basis of a crime [he] committed while still a minor."[3]  The flaw in this argument is that defendant did not face the death penalty as punishment for the crime he committed as a juvenile.  He faced that penalty for murdering Guevara when he was an adult, having suffered a prior murder conviction.  (Cf. *Bivert*, *supra*, 52 Cal.4th at p. 123.)  "As we have previously noted, *Roper v. Simmons*, *supra*, 543 U.S. 551, spoke only to the question of punishment for juvenile offenses . . . ."  (*Bivert*, at p. 122, citing *People v. Bramit* (2009) 46 Cal.4th 1221, 1239.)  Defendant provides no authority for the proposition that it is

---

[2]     In a supplemental brief, defendant argues that the Fifth, Eighth, and Fourteenth Amendments barred the use of his juvenile conviction as an aggravating circumstance.  We have long rejected that claim, and defendant fails to persuade us to alter our view.  (*Bivert*, *supra*, 52 Cal.4th at p. 122.)

[3]     Defendant also cites *Graham v. Florida* (2010) 560 U.S. 48 and, in a supplemental brief, *Miller v. Alabama* (2012) 567 U.S. __ [132 S.Ct. 2455].  In *Graham*, the court held that juveniles who commit nonhomicide offenses cannot constitutionally be sentenced to life without possibility of parole.  In *Miller*, the court reached the same conclusion with regard to murders committed by juveniles.  Neither case addresses the permissible punishment for adults, or the use of prior juvenile convictions as special circumstances.

7

unconstitutional to base a special circumstance on a prior conviction for a murder committed as a juvenile. Adults who commit first degree murder despite having a previous murder conviction, whether or not the prior offense occurred when they were juveniles, are a distinct subclass of murderers that can "with reliability be classified among the worst offenders." (*Roper*, *supra*, 543 U.S. at p. 569; see *People v. Bacigalupo*, *supra*, 6 Cal.4th at pp. 467-468.)

Furthermore, defendant offers no persuasive reason why it should be constitutional for a jury to consider a murder committed as a juvenile for the purpose of its penalty determination, but unconstitutional for the state to include convictions for such murders in the prior-murder-conviction special circumstance. It is true that special circumstances and aggravating factors serve different functions in our capital scheme, but in neither instance is the defendant being punished for juvenile misconduct. In both instances, the past conduct only serves as a guiding consideration: a preliminary one, as a special circumstance determining death eligibility for a murder committed as an adult, and an ultimate one, as an aggravating factor to be weighed in the final determination of the appropriate penalty for that murder. In *People v. Pride* (1992) 3 Cal.4th 195, we noted that basing an aggravating factor on a conviction for a felony committed as a juvenile did not amount to added punishment for the prior crime. Rather, the jury was properly allowed to weigh the fact that the defendant committed the capital crime undeterred by his prior conviction. (*Id*. at p. 257.)

It does not violate the Eighth Amendment for the Legislature to conclude, as a matter of policy, that an adult who murdered as a juvenile, failed to learn from that experience, and killed yet again, is a person "within the narrowed class of murderers for whom death would be an appropriate penalty." (*People v. Bacigalupo*, *supra*, 6 Cal.4th at p. 468.) The punishment is not imposed for the

8

juvenile offense, but for the crime committed as an adult, considered in light of the defendant's criminal history.

Defendant argues that section 190.2, subdivision (a)(2) creates an "unsupportable and unreliable distinction" between two classes of adult capital defendants who have previously committed murder as juveniles: those whose prior murders were tried in juvenile court and those whose prior murders were tried in superior court. However, he fails to support this equal protection claim with a showing that the classification affects similarly situated groups. (See *Manduley v. Superior Court* (2002) 27 Cal.4th 537, 568 (*Manduley*).) Equal protection principles do not foreclose the Legislature from concluding that those who commit a capital crime after being convicted of a juvenile murder in superior court are more culpable than those whose prior murder was adjudicated in juvenile court.

Defendant also contends that the use of juvenile murder convictions as special circumstances violates the Eighth Amendment and the constitutional guarantees of due process and equal protection because California's juvenile transfer policies permit prosecutors and juvenile courts to exercise arbitrary discretion over which homicides result in murder convictions instead of juvenile court adjudications. At the time of defendant's prior conviction, he was presumptively unfit for treatment under the juvenile court law, due to the serious nature of the charged crime. (See *Manduley*, *supra*, 27 Cal.4th at pp. 548-549.) In *Manduley*, reviewing subsequent changes in the governing statutes that *broadened* the circumstances in which minors over the age of 14 can be prosecuted as adults, and *increased* the discretion of prosecutors to file such proceedings, we held that the expanded procedures violated neither due process nor equal protection principles. (*Id.* at pp. 562-573.) Our reasoning applies with even greater force to the policies in place when defendant was prosecuted as a juvenile.

9

Defendant seeks to distinguish *Manduley* on the basis that it says nothing about the constitutionality of juvenile transfer procedures in the context of rendering a defendant eligible for the death penalty.  He claims that because a juvenile's culpability, maturity, and capacity for treatment and consideration as an adult are not individually considered in the transfer process, a resulting conviction may not constitutionally serve as a special circumstance.  We are not persuaded.  The prior-murder special circumstance does not turn on the procedures underlying the prior conviction, but on the gravity of the conduct that is the necessary predicate of that conviction.

In *People v. Trevino* (2001) 26 Cal.4th 237, we held that a prior murder committed in Texas when the defendant was 15 years old was a proper basis for a special circumstance finding, even though the defendant could not have been prosecuted as an adult in California at the time of that murder.  We noted that under section 190.2, subdivision (a)(2), "the focus is on the *conduct*, not the age or other personal circumstances of the person who engaged in that conduct.  It is the *offense*, and not necessarily the offender, that must satisfy statutory requirements . . . ." (*Trevino*, at p. 241.)  *Trevino* rejected the idea that " 'every time the prosecution allege[s] a murder conviction from a foreign jurisdiction, the trial court must determine whether the guilt ascertainment procedures of that jurisdiction afforded the same procedural protections as those in California.' " (*Id.* at p. 243, quoting  *People v. Andrews* (1989) 49 Cal.3d 200, 222.)  "Because the age of the offender is not an element of first or second degree murder under California law, the prior-murder special circumstance may be based on a conviction in another jurisdiction for a crime for which the defendant could not have been tried as an adult in California." (*Trevino*, at p. 244.)

Thus, the procedures for trying juveniles as adults have no bearing on whether a prior murder conviction qualifies as a special circumstance, so long as there is no constitutional infirmity in the procedures themselves. (See *Manduley*, *supra*, 27 Cal.4th at p. 573 [rejecting claim that prosecutorial discretion in charging juveniles as adults violates equal protection clause].) The high court's Eighth Amendment jurisprudence on punishment for crimes committed by juveniles does not speak to the question of special circumstances for crimes they commit later as adults. When a murder committed by a juvenile results in an adult criminal conviction, there is no legal proscription against the use of that conviction as a special circumstance if the defendant murders a second victim after reaching the age of majority.

### 2. *Adequacy of Voir Dire*

#### a. *Background*

At an early stage of the pretrial proceedings, the court brought up the subject of voir dire. Defense counsel said he had a questionnaire, "unless you have your own you like to use." The court replied that in the absence of pretrial publicity, it did not find questionnaires especially helpful. It had "done it both ways," but told counsel it was inclined to do the questioning itself. The court invited counsel to watch it conduct such an oral voir dire in an upcoming case, adding that they could review the transcript if they were unable to attend. At a subsequent hearing, the court reaffirmed that it would handle the voir dire. Defense counsel stated, "that is fine," and noted that he had sent the court a questionnaire that it "might want to take a look at." Counsel said, "I am not strongly advocating a questionnaire, but . . . it might be helpful." The case was continued for further pretrial discussions.

Several weeks later, the court proposed bifurcating the special circumstance question from the rest of the guilt phase. If defendant were to be convicted, the

11

special circumstance would be tried at a second phase. For purposes of the death-qualification voir dire, the jury would be informed of the charges against defendant, and told there was a special circumstance allegation, but the nature of that allegation would not be specified. The court thought this was the fairest way to "minimize potential prejudice" to defendant. Defense counsel agreed. The court then described in some detail the manner in which it would conduct voir dire, and asked counsel if there were any particular topics they wanted the court to explore. It said it would be happy to consider any questions they submitted.

Defense counsel objected to questioning prospective jurors in the presence of the other panelists. The court observed that "the law has been changed, as you know," and said, "if I feel it's not going well, then we'll reconsider. But I'm comfortable we can do it that way." Counsel maintained his objection, and brought up the questionnaire he had submitted. The court said it would review the questionnaire "for any particular questions," but was not inclined to ask the jurors to complete it. Counsel lodged an objection.

Jury selection began on January 25, 1999. The court excused some panelists for hardship, personal knowledge of witnesses, or close ties to law enforcement. It gave the remaining candidates a clear, detailed, and conversational explanation of the voir dire process and the procedures followed in capital cases. It emphasized the importance of finding jurors who could be impartial and objective. It urged the panelists to give true and complete answers, telling them that if they wanted to discuss an answer privately they could do so at side bar. The court said the most important thing was for them to "tell us what you think," not "what you think we want to hear. There are no right answers to the questions that I am going to be asking you this morning." It added that it was "important that we learn what's on your mind," and advised the panelists not to be affected by the answers of others.

12

The court then explained the presumption of innocence, the prosecutor's burden, the defendant's right not to testify, and the jurors' obligation to avoid prejudgment. Periodically, the court stopped to ask if anyone had a problem with the concepts it was discussing. It next described the phases of a capital trial, telling the panel that if defendant was found guilty of murder, it would next consider the special circumstance allegation. Only if the jury found it true would there be a penalty trial. If defendant was found not guilty, or the special circumstance not true, "we go home." The court noted, "now, some of you might be saying, my goodness, judge, why are you even talking about this when the defendant is presumed to be innocent? Well, I talk about it because this is the only chance we have to talk to you about it. We don't want to surprise you. And it is important for us to get your views and feelings about the death penalty."

The court paused to make sure it was "getting through to folks," calling on a panelist at random to ask if its explanations were clear. It then explained how the penalty phase would operate, generally describing the mitigating evidence the defense might put on ("the good things in the defendant's life and background") and the aggravating evidence the prosecution might present ("any bad things in the defendant's background"). The only choices before the jury would be life in prison without parole, "which means the defendant will not be released," and the death penalty, which is "normally done by lethal injection." The court emphasized that if the mitigating evidence outweighed the aggravating evidence, or if the balance was equal, "the jury must vote for life." Only if the aggravating evidence substantially outweighed the mitigating evidence could the death penalty be considered, and "even then the jury . . . is not required to vote for death."

The court advised the panel that the cost of incarceration was an irrelevant consideration, that the jury must accept the death penalty as more severe than life in prison, and that penalty considerations could not be allowed to affect the guilt

13

determination.  It then explained why the candidates' feelings about the death penalty were important.  "Jurors who would automatically vote for death are not allowed to sit in this kind of case, just as those who would automatically vote for life are not permitted to sit," because "that kind of juror is incapable of weighing the mitigating evidence against the aggravating evidence."  "What we need are jurors who can consider all the evidence and make a decision based on the evidence."  The court added that it would be giving the panelists some time to think over what it was telling them.

In the court's experience, people "break down into four categories."  Those in category one do not believe in the death penalty and could never vote to sentence someone to death.  Persons in category two are strong proponents of the death penalty and would always vote for death if someone took a life.  Those in category three believe in the death penalty, but could not bring themselves to vote for it in a particular case, even if they agreed that the aggravating evidence substantially outweighed the mitigating evidence.  The court described in detail its past experience with jurors who, during the proceedings, discovered that the burden of sitting in judgment on the life of another was simply too much for them.[4]  It advised the candidates, "this is a serious matter, folks.  Please think

---

[4]  "I had a case years ago, two boys were stabbed to death in the desert.  We went through a lengthy selection process of jurors. . . . The People were seeking the death penalty.  And yes, the jurors answered all the questions.  Yes I believe in the death penalty.  Yes I could weigh the mitigating and aggravating circumstances.  And we ended up selecting the jury.  And I was over talking to the attorneys at side bar about some matter.  And the clerk pointed out that one of the jurors was crying.  She hadn't even heard any evidence, but suddenly the enormity of the idea that she was going to be sitting in judgment on another human being had come home to her.  And she couldn't do it.  And I would call her a category three person, somebody who says, yes, I believe in the death penalty, but when you get right down to it, it's too much, too much for her."

about this, give a lot of thought to it." Category four candidates were those who could keep an open mind, consider all the evidence, and return a verdict of either life in prison or death.

The court told the panel that unlike at the guilt phase, where the prosecution would bear the burden of proof, there would be no burden of proof at the penalty phase. "It is up to the jurors to weigh all the evidence, to consider the arguments and to make a decision." The court emphasized that it did not mean to tell the candidates how to decide the case, but needed to ascertain their feelings about the death penalty. It then took a recess, asking them to ponder their views in light of the court's explanations.

After the recess, the court questioned the prospective jurors individually. It began by asking their reactions upon learning this was a capital case, giving them an open-ended opportunity to describe their thoughts, before asking which category they placed themselves in. When this pattern had been established, the court no longer directly asked for general reactions but simply called on the panelists and let them speak. If any panelist expressed any misunderstanding of the process, the court used the occasion to clarify the point for them and the panel as a whole. When the candidates identified the category to which they belonged, the court restated the views that characterized that category. It also periodically reaffirmed the serious nature of the process, and encouraged candid and independent answers.

After 27 jurors had been questioned, defense counsel objected to the way the court was conducting voir dire.[5] He said, "It is too fast. I can't follow it. You

---

[5]     Of the panelists questioned to this point, 19 placed themselves in category four, though a number of those expressed reservations about voting for death. Three individuals put themselves in category three, and five in category one.

15

are asking, are you number one, two, three, four. It is just meaningless except [for] your definition that is recorded in memory before we took a break. I think you have to delve into these individuals a little more in depth." The court disagreed, noting that the most recent panelist had explained "why she is a number one," and declaring itself "very comfortable with the way this voir dire is going."

After completing the questioning of the first panel, the court called counsel to the bench and said it intended to excuse all those who had placed themselves in categories one and three.[6] Defense counsel objected again, this time on the ground that the court had not attempted to "rehabilitate" the prospective jurors in category three, instead asking leading questions as to their inability to impose the death penalty that allowed them to simply say, "that is right." The court responded that it had no "obligation to rehabilitate anybody on this very serious issue." It noted that the panelists had categorized themselves, its follow-up questions were intended to clarify their views, and they had provided a variety of responses with no indication of being influenced by the process. The court was "comfortable with excusing these people because I do believe that they have honestly told us that they have feelings that would substantially impair their ability to serve as jurors in this case."

The court excused the 21 panelists who declared they were either opposed to the death penalty in all cases or unable to vote for death despite having no categorical objection to capital punishment. It then questioned the remaining candidates on matters unrelated to the penalty determination. When the voir dire was finished, it invited counsel to submit follow-up questions. Neither did, except

---

**6** A total of 13 prospective jurors had identified themselves as category three, eight as category one, and 35 as category four. No one on this panel considered themselves to be in category two.

16

for the prosecutor asking the court to ascertain whether one candidate who had previous experience on a capital case had participated in a penalty phase. There were no challenges for cause. The court moved then to peremptory challenges.

The next day, the court followed substantially the same procedure with a second panel of prospective jurors, providing a detailed introductory discussion and then questioning each panelist individually.[7] Six candidates were excused because they did not believe in the death penalty and would never vote for it, two because they would always vote for death, including one person who volunteered that he would always vote for death if the defendant had a prior murder conviction, and two because they were not necessarily opposed to the death penalty but could not impose it themselves. Fifteen prospective jurors in this panel put themselves in category four, able to weigh the evidence and reach either result. However, the court failed to question three members of the second panel as to their death penalty views. These omitted candidates were included in the next round of voir dire on general topics. None of them spoke up to say they had not been asked for their death penalty views, nor did either attorney bring the omission to the court's attention at any point.

At the end of the second panel's general voir dire, the court again asked counsel if they had follow-up questions. Defense counsel obtained clarification on the nature of a criminal case in which one candidate had served as a juror, and asked the court to advise the panel not to draw adverse inferences because defendant was in custody or because the trial was being held on a floor of the

---

[7] With the second panel, the court did not take a break between its general explanations and the individual questioning. It did, however, pause during the explanations to admonish the jury to think about what it was saying, and remind them that it would be talking to each one of them about their views.

17

courthouse with extra security screening.  The court gave these advisements.

Again there were no challenges for cause, and the court moved on to peremptories.

The last juror seated, Juror No. 10, was one of those whose death penalty views

were not explored.

b. *Analysis*

Defendant raises a series of challenges to the conduct of voir dire.  He

claims:  (1) Questioning prospective jurors as a group about their views on the

death penalty is an unconstitutional practice in general;[8] (2) the court erred in this

case by denying his particular request for sequestered voir dire; (3) the manner in

which the court conducted voir dire made it impossible to determine whether the

candidates held disqualifying views about capital punishment;[9] (4) the four

categories framed by the court for the candidates were defective; (5) relying on

jurors' self-assessments was improper; (6) the incomplete voir dire resulted in the

seating of a juror who was not death qualified; and (7) the court's questioning on

general topics was flawed because it relied on panelists coming forward with

information instead of being asked specific questions, particularly on the subject

of gang membership.

Code of Civil Procedure section 223, adopted by initiative measure in 1990,

requires the court to conduct voir dire in criminal cases.  At the time of trial,

section 223 stated in pertinent part:  "In a criminal case, the court shall conduct the

examination of prospective jurors.  However, the court may permit the parties,

upon a showing of good cause, to supplement the examination by such further

---

[8]      He cites the Sixth and Fourteenth Amendments, and sections 7, 15, 16, and
17 of article I of the California Constitution.
[9]      In challenging the adequacy of the voir dire, defendant generally relies on
the Sixth, Eighth, and Fourteenth Amendments.

18

inquiry as it deems proper, or shall itself submit to the prospective jurors upon such a showing, such additional questions by the parties as it deems proper. Voir dire of any prospective jurors shall, where practicable, occur in the presence of the other jurors in all criminal cases, including death penalty cases." (Added by Prop. 115, as approved by voters, Primary Elec. (June 5, 1990).)[10] Here, the court invited counsel to submit follow-up questions, without seeking a showing of good cause.

We have repeatedly rejected constitutional challenges to the statutory authorization of group voir dire in capital cases. (*People v. Chism* (2014) 58 Cal.4th 1266, 1286; *People v. Watkins* (2012) 55 Cal.4th 999, 1011; *People v. Thomas* (2012) 53 Cal.4th 771, 789.) Defendant does not convince us to alter our view on this point. Indeed, the record in this case demonstrates the advantages of group voir dire. Panelists provided a variety of responses reflecting divergent views on the death penalty and their ability to serve on a capital jury. The court was able to educate each panel as a whole by explaining misconceptions reflected in some prospective jurors' comments. The court emphasized to all that it was seeking each panelist's own views, that there were no right or wrong answers, and that each person was in the best position to evaluate his or her own views.

---

**10** Effective January 1, 2001, the statute was amended to give counsel for each party an expanded but not unlimited right to examine prospective jurors through direct oral questioning "[u]pon completion of the court's initial examination." (Code Civ. Proc., § 223, as amended by Stats. 2000, ch. 192, § 1, p. 2216.) The provision requiring group voir dire where practicable remained unchanged, as did the specification that the trial court's exercise of its discretion over the manner in which voir dire is conducted "shall not cause any conviction to be reversed unless the exercise of that discretion has resulted in a miscarriage of justice, as specified in Section 13 of Article VI of the California Constitution." (*Ibid*.)

19

Instructions of this sort are more effectively delivered in a group setting than in individual interviews.

Nor does defendant show that the court abused its discretion in denying his request for individual questioning in this case. Defense counsel made a blanket objection to the conduct of group voir dire, without any specific claim that it would be "impracticable" under the particular circumstances. (Code Civ. Proc., § 223.) The court stated its willingness to reconsider its decision if "it's not going well." Counsel interposed no further objection to questioning the candidates in groups. [11] No error appears. (See *People v. Capistrano* (2014) 59 Cal.4th 830, 863 (*Capistrano*), affirming the denial of a "generic, boilerplate" motion for sequestered voir dire "that made no attempt to show specifically why open court voir dire in this case was not practicable.")

Next, defendant contends the method of voir dire employed by the court was insufficient to reliably determine whether the panelists' views would disqualify them from serving as jurors at a penalty trial. "Recent decisions of this court have emphasized the importance of meaningful death-qualifying voir dire. We have reminded trial courts of their duty to know and follow proper procedure, and to devote sufficient time and effort to the process. [Citations.] At bottom,

---

[11] On appeal, defendant asserts that the prospective jurors' answers were influenced by the group questioning, arguing that the first 13 candidates in the first panel all placed themselves in category four, meaning they could keep an open mind and make a decision based on the aggravating and mitigating evidence. However, there was considerable variety in the responses of these candidates. Two said they were between categories three and four, and others expressed doubts about their ability to vote for death, or volunteered that they would vote for death only in an extreme case, or only if they were convinced of guilt beyond a shadow of a doubt. Thus, the record does not support defendant's suggestion that the prospective jurors were taking cues from the responses of others. (See *People v. Brasure* (2008) 42 Cal.4th 1037, 1053.)

both the court and counsel 'must have sufficient information regarding the prospective juror's state of mind to permit a reliable determination as to whether the juror's views [on capital punishment] would " 'prevent or substantially impair' " the performance of his or her duties.' [Citation.] . . . [¶] Nonetheless, the trial court has broad discretion over the number and nature of questions about the death penalty. We have rejected complaints about 'hasty' [citation] or 'perfunctory' voir dire." (*People v. Stitely* (2005) 35 Cal.4th 514, 539–540; accord, *Capistrano*, *supra*, 59 Cal.4th at p. 856; see *Wainwright v. Witt* (1985) 469 U.S. 412, 424 (*Witt*).) "Unless the voir dire 'is so inadequate that the reviewing court can say that the resulting trial was fundamentally unfair, the manner in which voir dire is conducted is not a basis for reversal.' " (*People v. Contreras* (2013) 58 Cal.4th 123, 143 (*Contreras*).)

Defendant claims that in cases where we have rejected claims of hasty or perfunctory voir dire, the courts used written questionnaires as a supplement. (*People v. Stitely*, *supra*, 35 Cal.4th at pp. 538-540; *People v. Navarette* (2003) 30 Cal.4th 458, 486-488.) However, in *People v. Hernandez* (2003) 30 Cal.4th 835, 855-856, we rejected such a claim without mentioning a questionnaire. And in *Capistrano*, *supra*, 59 Cal.4th at pages 854-856, we found no error in the court's assertedly perfunctory dismissal of a number of prospective jurors based on oral questions about their death penalty views, before a questionnaire was passed out. We have never held that a questionnaire is required for purposes of voir dire. (*People v. Carpenter* (1997) 15 Cal.4th 312, 353; see *People v. Fuiava* (2012) 53 Cal.4th 622, 652 (*Fuiava*).) There is no magic formula for qualifying prospective jurors in a capital case. Questionnaires may be problematic if couched in legalistic terms that are rigid or confusing. What is important is a process that allows the court and counsel to ascertain the panelists' honest views about the death penalty and their ability to perform a juror's duty.

21

The court's approach in this case was personal and conversational, both with the panels as a whole and during individual questioning. It provided the panels with a comprehensive description of the trial process in a capital case, followed by specific inquiries about each candidate's views on the question of penalty. This process was within the limits of the broad discretion our trial courts exercise over methods of voir dire. The introductory explanation of the juror's role in a capital case was informal, clear, and detailed. The court took care to ensure that the concepts being conveyed were understood, and to impress on the panelists that it was not seeking to influence their answers or ultimate votes, should they be seated on the jury. It repeatedly emphasized the seriousness of the task at hand, as well as the personal and normative nature of penalty deliberations.

Once individual questioning began, many prospective jurors were asked an initial open-ended question about how they felt when they learned this was a capital case. The court carefully ascertained each candidate's self-assessment. No panelist expressed confusion or professed inability to self-classify. Nor, contrary to defense counsel's claim when he lodged his objection to the process, were the panelists simply asked to assign themselves a number. If a candidate referred to a number without describing the category, the court followed up with a clarifying question to ensure that the classification properly reflected the candidate's views. And because the questioning took place in a group setting, everyone heard the description of the classifications many times.

Defendant's complaints about the court's failure to "rehabilitate" prospective jurors who said they would be unable to impose the death penalty are misplaced. Counsel are entitled to ascertain a prospective juror's true views on the death penalty. Once those views have been made clear, the court is not obliged to question them further. Nor do counsel have the right to try to influence or characterize those views to gain a strategic advantage in the selection process. "If

22

a prospective juror states unequivocally that he or she would be unable to impose the death penalty regardless of the evidence, the prospective juror is, by definition, someone whose views 'would "prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." ' (*Witt*, *supra*, 469 U.S. at p. 424.) Further inquiry concerning the juror's ability to follow the law is not required." (*Capistrano*, *supra*, 59 Cal.4th at p. 859.)

Defendant faults the court for not asking a number of the questions proposed in the questionnaire submitted by defense counsel. But merely proffering a questionnaire is no substitute for making specific objections to the court's failure to ask certain questions. We have held that "a defendant may not challenge on appeal alleged shortcomings in the trial court's voir dire of the prospective jurors when the defendant, having had the opportunity to alert the trial court to the supposed problem, failed to do so. It is not sufficient . . . for a defendant merely to suggest that particular questions be asked, and then silently stand by when the trial court suggests and subsequently takes a different course — a trial court reasonably could view such silence as constituting assent to the court's approach." (*Fuiava*, *supra*, 53 Cal.4th at p. 653; accord, *Contreras*, *supra*, 58 Cal.4th at p. 144.)

Here, while defense counsel objected to the speed of the court's questioning and its failure to "rehabilitate" prospective jurors who placed themselves in category three, he did not object to the court's failure to ask any particular question. Accordingly, defendant's claims in this regard are forfeited. (*Fuiava*, *supra*, 53 Cal.4th at p. 653; *People v. McKinnon* (2011) 52 Cal.4th 610, 640 (*McKinnon*); *People v. Foster* (2010) 50 Cal.4th 1301, 1324.)[12] Moreover,

---

[12] For example, defendant complains that the court did not ask the prospective jurors if they would invariably vote for the death penalty when the defendant has

*(footnote continued on next page)*

defendant's complaints about the questioning of individual panelists regarding their death penalty views fails to account for the court's lengthy prefatory remarks, describing the nature of the penalty phase and the jurors' responsibility to weigh the evidence in aggravation and mitigation without allowing their personal views to predetermine the outcome.

We emphasize that the prospective jurors were properly informed of the extent of their discretion. Importantly, the trial court correctly and repeatedly instructed them that they were not required to vote for death. (See *People v. Brown* (1985) 40 Cal.3d 512, 538–544.) In one representative instance, it told the panelists, "nobody is telling you you have to vote for death, okay. The law says that there is a presumption in favor of life, actually. . . . And [it] only allow[s] the jury to vote for death if the aggravating evidence so substantially outweighs the mitigating evidence that the jury believes that death is appropriate . . . ." The court reminded them that "[i]t is only if you have substantial disparity in favor of the aggravating [factors] that death can even be considered." The court's accurate descriptions of the extent of juror discretion informed the candidates' self-categorization. In particular, the court's explanations made it unlikely that panelists would have placed themselves in category three merely because they

---

*(footnote continued from previous page)*

been convicted of more than one murder. However, after the court declined to use the questionnaire submitted by defense counsel, counsel did not ask the court to explore that subject. Indeed, counsel specifically agreed with the court's suggestion *not* to inform the jury that the special circumstance in this case was a prior murder, in order to avoid prejudicing defendant at the guilt phase. In any event, the court did not bar counsel from inquiring about that or any other subject. (Compare *People v. Cash* (2002) 28 Cal.4th 703, 721.)

24

were reluctant to vote for death, or apprehensive that the law would require them to vote for death even if they thought it inappropriate in the particular case.

Even if it were preserved, there is no merit in defendant's claim that the court failed to inquire whether the prospective jurors would always favor the death sentence over life without parole whenever the two alternatives are available. The court thoroughly explained to the panels that these would be the alternatives before the jury in a penalty phase. Its inquiry as to whether the candidates would always favor the death penalty was premised on that consideration. Similarly, while defendant faults the court for not questioning the jurors about their ability to fairly evaluate the evidence at the guilt phase, the court's introductory comments emphasized that the guilt and penalty phases were separate, that the defendant was presumed innocent, and that "you can't be looking over your shoulder" at the guilt phase by considering its implications as to penalty.

Defendant's objections to the way the court framed its four categories likewise fail, in light of the court's comprehensive review of what would be required of jurors during penalty deliberations. In that context, the categories were sufficient for the purpose of death-qualification voir dire.[13] Defendant also complains that the voir dire unduly relied on prospective jurors' self-assessments. Again the court's explanations sufficiently focused the inquiry. When they were asked to categorize themselves, the candidates had in mind the court's descriptions

[13] Defendant claims the second panel was never given a definition of category four, comprising jurors who could make a penalty determination based on the evidence. However, the court thoroughly described the qualities needed to serve on a penalty jury before questioning this panel. When individual voir dire began, the court made it plain that "what I would call a category four person" was one who "would be able to consider all the mitigating evidence and all the aggravating evidence and to weigh them and to make a decision." No prospective juror in the second panel displayed any confusion as to category four.

25

of the penalty phase and the qualities required of jurors. Further, the voir dire process necessarily depends to a significant degree on self-assessment. No one is in a better position to know the panelists' views and inclinations than they themselves. Here the court sought direct, unequivocal answers from the candidates regarding their death penalty views, encouraging them to be honest and to keep in mind the importance of the matter. It was able to observe not only the content of the responses, but also the manner in which they were conveyed.

"[W]e apply a 'rule of deference' [citation] based on the trial court's ability to assess the demeanor and credibility of the prospective [juror]." (*Capistrano*, *supra*, 59 Cal.4th at p. 859.) " '[A] trial judge who observes and speaks with a prospective juror and hears that person's responses (noting, among other things, the person's tone of voice, apparent level of confidence, and demeanor), gleans valuable information that simply does not appear on the record. [Citation.] As the high court observed in *Witt*, *supra*, 469 U.S. 412, 428, "the question whether a venireman is biased has traditionally been determined through *voir dire* culminating in a finding by the trial judge concerning the venireman's state of mind . . . based upon determinations of demeanor and credibility that are peculiarly within a trial judge's province." ' " (*Capistrano*, at pp. 855-856.)

Accordingly, we reject defendant's challenges to the court's method of conducting the death-qualification voir dire in this case. A closer question arises from the court's failure to apply its method consistently with the second voir dire panel. It appears the court questioned these 28 panelists as they sat in the spectator section of the courtroom. In so doing it overlooked three candidates, including the one who became Juror No. 10. Defense counsel did not bring the oversight to the court's attention, however, and therefore this claim of error is forfeited. Although at the time of defendant's trial no objection was required to preserve a claim that a prospective juror was improperly *excused* based on his or

her views of capital punishment, that rule has never been applied to other jury selection issues, including claims of inadequate voir dire. (*McKinnon*, *supra*, 52 Cal.4th at pp. 637, 640.)

The court and both attorneys must bear a share of blame for failing to ensure that all panelists were questioned. However, the primary responsibility for protecting defendant's interests lay with defense counsel. There is no excuse for his failure to alert the court that some candidates had been passed over. Contrary to defendant's suggestion that the speed of the process was such that it was "virtually impossible" for counsel to keep track, it was a simple matter to record the prospective jurors' identities and the category to which they assigned themselves. When the questioning of the second panel was completed, the court conferred with counsel about which candidates were in categories one and three, and neither attorney expressed any discomfort with his ability to monitor the classifications as they had occurred.

Juror No. 10 *was* questioned during the voir dire covering general subjects. She did not mention that she had been overlooked during the previous round, but at that point it should have been clear to all that her views on the death penalty had not been ascertained. Defense counsel was offered a chance to pose follow-up questions at the end of the general voir dire, but did not explore the matter. He had a peremptory challenge available when he agreed to accept Juror No. 10, the last panelist to be seated. We cannot overlook the possibility that counsel was aware of the court's omission, and refrained from pointing it out for tactical purposes. Based on Juror No. 10's answers, the defense may have decided she was inclined in its favor, or at least not negatively disposed. A high school graduate, she and her husband both worked as mail handlers for the post office. She had a brother serving a long prison sentence for a purse snatching, with a prior conviction for "hijacking." She had served on both civil and criminal juries. She

27

belonged to no organizations and had never been in the military. Though she did not own a gun, she had "no problem" with gun ownership.

The consideration that counsel may have chosen to take a chance with this panelist and create a claim of penalty phase error goes to the heart of the forfeiture rule. "[A]s a general rule, 'the failure to object to errors committed at trial relieves the reviewing court of the obligation to consider those errors on appeal.' [Citations.] This applies to claims based on statutory violations, as well as claims based on violations of fundamental constitutional rights. [Citations.] [¶] The reasons for the rule are these: ' "In the hurry of the trial many things may be, and are, overlooked which would readily have been rectified had attention been called to them. The law casts upon the party the duty of looking after his legal rights and of calling the judge's attention to any infringement of them. If any other rule were to obtain, the party would in most cases be careful to be silent as to his objections until it would be too late to obviate them, and the result would be that few judgments would stand the test of an appeal." ' " (*In re Seaton* (2004) 34 Cal.4th 193, 198; accord, *McKinnon*, *supra*, 52 Cal.4th at p. 638.) Accordingly, defendant did not preserve this claim of inadequate voir dire. (*People v. Taylor* (2002) 48 Cal.4th 574, 608.)

Ordinarily we proceed to consider the merits of forfeited claims of insufficient voir dire, as we did in *People v. Taylor*, *supra*, 48 Cal.4th at page 608. However, counsel's inaction leaves us with no basis for doing that here. Juror No. 10 may have been biased against the death penalty, or perfectly neutral. This record affords no grounds for us to conclude that the trial was " 'fundamentally unfair.' " (*Contreras*, *supra*, 58 Cal.4th at p. 143.) To establish that the erroneous inclusion of a juror violated the right to a fair and impartial penalty phase jury, a defendant must show that an incompetent juror actually sat on the jury that imposed the death sentence. (*People v. Blair* (2005) 36 Cal.4th 686, 742; see

28

*People v. Black* (2014) 58 Cal.4th 912, 919-920.) Here, defendant failed to make a record that would permit us to evaluate his claim.

Defendant's final challenge to the voir dire process concerns the questioning on general topics. He claims the court failed to adequately explore the candidates' views about gang members, asking one prospective juror only, "do you know anybody in a gang?" However, defense counsel made no objection. Furthermore, shortly after this question the court explained to the panel how gang evidence might properly be used at trial. It cautioned: "But I want to make sure I don't have a bunch of jurors that are going to say, well, gee, the fellow's a gang member, therefore, he's guilty. You've got to keep an open mind. Wait to hear what the evidence is." This claim of error is meritless as well as forfeited. (*Fuiava*, *supra*, 53 Cal.4th at pp. 653-655.)

### 3. *Constitutionality of Death Qualification Process*

"Citing the Fifth, Sixth, Eighth and Fourteenth Amendments to the federal Constitution and article I of the California Constitution, defendant contends that the death qualification of juries in California is unconstitutional. The claim is forfeited by defendant's failure to raise it below. (*People v. Howard* (2010) 51 Cal.4th 15, 26 (*Howard*).) It is also meritless.

" 'The death qualification process is not rendered unconstitutional by empirical studies concluding that, because it removes jurors who would automatically vote for death or for life, it results in juries biased against the defense. [Citations.] [¶] *Lockhart v. McCree* (1986) 476 U.S. 162 . . . , which approved the death qualification process, remains good law despite some criticism in law review articles. [Citations.] "We may not depart from the high court ruling as to the United States Constitution, and defendant presents no good reason to reconsider our ruling[s] as to the California Constitution." [Citation.] [¶] The impacts of the death qualification process on the race, gender, and religion of the

jurors do not affect its constitutionality. [Citations.] Nor does the process violate a defendant's constitutional rights, including the Eighth Amendment right not to be subjected to cruel and unusual punishment, by affording the prosecutor an opportunity to increase the chances of getting a conviction. [Citations.] Defendant claims the voir dire process itself produces a biased jury. We have held otherwise. [Citation.] [¶] Death qualification does not violate the Sixth Amendment by undermining the functions of a jury as a cross-section of the community participating in the administration of justice. [Citations.] Finally, defendant's constitutional rights were not violated by the prosecutor's use of peremptory challenges to exclude jurors with reservations about capital punishment.' (*Howard*, *supra*, 51 Cal.4th at pp. 26–27; see *People v. Taylor*, *supra*, 48 Cal.4th at pp. 602–603.) We adhere to the views expressed in these decisions and reject defendant's claims." (*People v. Tully* (2012) 54 Cal.4th 952, 1066; see also, e.g., *Capistrano*, *supra*, 59 Cal.4th at p. 864.)

B. *Guilt Phase Issues*

1. *Exclusion of Evidence That Echeverria Was Convicted of Manslaughter*

Before his opening statement, defense counsel approached the bench and told the court he and the prosecutor had discussed whether the jury should be informed that Echeverria had been convicted of manslaughter for Guevara's killing. Counsel said he intended to do that, though he conceded the prosecutor "may be right" that the conviction was irrelevant. The prosecutor objected. The court ruled that "you cannot tell them this guy got manslaughter because it was a different case, different evidence . . . ." The court suggested counsel stipulate that Echeverria was convicted of the killing, without mentioning a specific crime. Counsel so stipulated.

30

Nevertheless, immediately before calling Echeverria to the witness stand, defense counsel renewed his request to inform the jury that Echeverria had been convicted of voluntary manslaughter. The prosecutor objected again, and again the court sustained the objection. It explained that the difficulty "this poses for the People is a suggestion that if one person who is involved in this was convicted of a particular crime, then the other participant allegedly involved should be convicted of the same crime. And this is an entirely different case. I think that it would be inviting the jury to speculate as to . . . why he was convicted of voluntary manslaughter as opposed to what the proper verdict might be in this case. And it might be . . . manslaughter. I believe he should be limited to stating that yes, I was convicted of something that arose from the same incident without specifying what felony."

Defendant claims the exclusion of evidence as to the nature of Echeverria's conviction violated his due process right to present a defense. He relies on cases holding that defendants must be allowed to present evidence that another person may have committed the charged crime. (*Chambers v. Mississippi* (1973) 410 U.S. 284; *Cudjo v. Ayers* (9th Cir. 2012) 698 F.3d 752.) These cases are inapposite; defendant presented Echeverria's testimony that it was Echevarria who killed Guevara. Defendant argues that the jury was required to speculate about Echeverria's level of culpability. Not so; the jury heard the evidence and was fully equipped to determine for itself the relative levels of Echeverria's and defendant's culpability. It could not know what evidence was presented at Echeverria's trial, nor what theories were pursued by the prosecution and the defense in that case. The trial court properly ruled that evidence of the specific crime of which Echeverria was convicted was irrelevant and misleading. (Evid. Code, § 352.)

31

## 2. *Sufficiency of the Evidence*

Defendant contends the evidence was insufficient to establish his guilt of first degree murder. The claim fails.

"Our task in deciding a challenge to the sufficiency of the evidence is a well-established one. '[W]e review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence — that is, evidence that is reasonable, credible, and of solid value — from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citations.] In cases in which the People rely primarily on circumstantial evidence, the standard of review is the same. [Citations.]' (*People v. Thomas* (1992) 2 Cal.4th 489, 514.) ' "An appellate court must accept logical inferences that the jury might have drawn from the evidence even if the court would have concluded otherwise. [Citation.]" ' (*People v. Halvorsen* (2007) 42 Cal.4th 379, 419.)" (*People v. Solomon* (2010) 49 Cal.4th 792, 811-812.)

Defendant disputes the credibility of Kathy Mendez's testimony, arguing that from her vantage point inside the Beef Bowl she could not have seen defendant and Echeverria wrestling with Guevara on the sidewalk, or defendant shooting into the Au Rendezvous Café next door. However, Mendez testified that she was standing at the end of a long line, nearly at the door of the Beef Bowl, and that the entire front wall of the restaurant was glass. The photographic evidence confirms that a person standing near the front of the restaurant would have a clear view of the sidewalk outside. Defendant also claims Mendez was mistaken when she said she saw Guevara walk by the Beef Bowl before the confrontation began. He notes that Guevara's car was parked in front of the Au Rendezvous, not the Beef Bowl, and that Emilio Antelo, the security guard who was standing outside near the Beef Bowl door, testified that Guevara had just begun to approach the Beef Bowl after getting out of his car when defendant and Echeverria accosted

32

him. While Mendez's testimony is inconsistent with the other evidence on this point, it is not an important detail. Furthermore, the jury was properly instructed on how to weigh conflicts in the testimony. (CALJIC Nos. 2.21.1 & 2.22.)

Defendant notes that Mendez gave inconsistent statements, both to the police and on the stand, about whether she saw him shooting. But when reminded of her second statement to the police, Mendez testified on direct, cross, and redirect examination that she saw defendant doing the shooting. It was for the jury to determine the credibility of her statements.

Defendant challenges Mendez's account of the wrestling on the sidewalk, claiming Antelo did not confirm it. Antelo, however, testified that he went inside the Beef Bowl as soon as the second armed man approached Guevara, because he "immediately thought there was going to be a problem." The third prosecution eyewitness, Patrick Turner, confirmed that the wrestling began on the sidewalk and continued into the Au Rendezvous.[14] Echeverria gave a similar account in his testimony, though he claimed that only he wrestled with Guevara.

Defendant contends the physical evidence was consistent with Echeverria's testimony. In fact, the evidence refuted his account and supported the conclusion that it was defendant who shot Guevara and inflicted some of Echeverria's wounds. As defendant concedes, the casings recovered at the scene established

---

[14] Defendant claims Turner was an entirely unreliable witness. It is true that Turner was unable to remember much on the witness stand, and appeared to confuse the color of defendant's and Echeverria's clothing. If he were the only witness, it is doubtful this case would have gone to trial. But he was not the only witness, and his statements to the police on the night of the shooting about the wrestling on the sidewalk, followed by a man shooting into the doorway of the Au Rendezvous, were consistent with Mendez's account and the shell casing evidence. The jury could reasonably have accepted Turner's testimony on this point as corroborative.

that only two weapons were used, a .25 caliber that left three casings and a 9 millimeter that left 12. Echeverria claimed he shot Guevara at very close range as they were wrestling, but there was no stippling around Guevara's wounds, indicating they were inflicted from a distance of greater than two feet. Echeverria said he was shot six times with a .25 caliber gun, but only three .25 caliber casings were recovered. The pattern of Guevara's wounds was consistent with being shot from medium range as he rolled on the floor of the Au Rendezvous, wrestling with Echeverria.

The prosecution's theory was that Guevara had managed to wrestle the .25 caliber weapon away from Echeverria and shoot him several times, explaining the soot found on Guevara's hands. Thereafter, defendant shot at both men from the doorway of the Au Rendezvous. This theory was consistent with the shell casing evidence. It was supported by Mendez's testimony that defendant had a 9 millimeter weapon and Echeverria had his gun when they confronted Guevara. It was also consistent with Antelo's testimony that the men who approached Guevara outside the Beef Bowl carried guns while Guevara did not.

Defendant claims the evidence was insufficient to show that the killing was not justified by Echeverria's lawful self-defense, or defendant's defense of Echeverria. The jury was instructed that the prosecution bore the burden of proving the homicide was not justifiable. It was also instructed that the right of self-defense is only available to a person who initiates an assault if that person (1) tries in good faith to refuse to continue the fight, and (2) clearly informs his opponent both that he wants to stop fighting, and that he has done so. Defendant does not dispute the correctness of this instruction, or its logical application to the defense of another. Here, there was ample evidence from which the jury could have found that defendant and Echeverria initiated the assault and never attempted to stop fighting with Guevara.

34

Defendant also claims the evidence of malice was insufficient, because the prosecution failed to disprove that he acted in a sudden quarrel, under heat of passion, in unreasonable self-defense, or in mutual combat. Again, however, the evidence strongly supported a finding that defendant acted as a deliberate aggressor in the confrontation. Thus, the jury could have found that the quarrel was not sudden, but intentionally provoked by defendant and Echeverria, and any heat of passion was not the sort that would be aroused in the mind of an ordinarily reasonable person, as the instructions required. The instructions also informed the jury that unreasonable self-defense has no application when a defendant's wrongful conduct created the circumstances that justified his adversary's use of force. Defendant does not challenge the propriety of these instructions.

Defendant further argues, at length, that the evidence was insufficient to establish deliberation and premeditation. We disagree. "In the context of first degree murder, premeditation means ' "considered beforehand" ' (*People v. Mayfield* (1997) 14 Cal.4th 668, 767) and deliberation means a ' "careful weighing of considerations in forming a course of action . . . " ' (*People v. Solomon* (2010) 49 Cal.4th 792, 812). 'The process of premeditation and deliberation does not require any extended period of time.' (*Mayfield*, at p. 767 [the true test of premeditation is the extent of the reflection, not the length of time].) ' "Thoughts may follow each other with great rapidity and cold, calculated judgment may be arrived at quickly . . . ." ' (*Ibid*.; see *id*. at pp. 767–768 [where defendant wrested the gun from and fatally shot an officer during a brief altercation, the jury could reasonably conclude that 'before shooting [the officer] defendant had made a cold and calculated decision to take [the officer's] life after weighing considerations for and against']; *People v. Rand* (1995) 37 Cal.App.4th 999, 1001–1002 [aiming weapon at victims whom shooter believed to be rival gang members constituted

sufficient evidence of premeditation and deliberation].)" (*People v. Shamblin* (2015) 236 Cal.App.4th 1, 10.)

Here, defendant brought a loaded gun with him to the Beef Bowl, demonstrating preparation. (See *People v. Lee* (2011) 51 Cal.4th 620, 636.) He told Echeverria to get *his* gun when they saw Guevara in the parking lot, which is substantial evidence of planning. (See *People v. Thomas*, *supra*, 2 Cal.4th at p. 517.) Echeverria testified that he armed himself because Guevara looked like a gang member, supplying evidence of motive for provoking a lethal confrontation. Defendant and Echeverria both cocked their guns as they approached Guevara, strongly suggesting they were contemplating a shooting. (See *People v. Rand*, *supra*, 37 Cal.App.4th at pp. 1001–1002.) The fact that Guevara was shot nine times at close range also supports the conclusion that the killing was deliberate. (See *Lee*, at p. 637; *People v. Gonzales and Soliz* (2011) 52 Cal.4th 254, 295.)

Even "assuming a reasonable jury could have found the evidence did not support premeditation and deliberation and returned a verdict of second degree murder, [defendant's conviction] must stand because, as we have stated, '[i]f the circumstances reasonably justify the jury's findings, the reviewing court may not reverse the judgment merely because it believes that the circumstances might also support a contrary finding.' " (*People v. Gonzales and Soliz*, *supra*, 52 Cal.4th at p. 295.)

### 3. *Use of Former CALJIC Nos. 8.71 and 8.72*

The jury was given the 1996 revised versions of CALJIC Nos. 8.71 and 8.72. The first of these instructions informed the jury: "If you are convinced beyond a reasonable doubt and you unanimously agree that the crime of murder has been committed by a defendant, but you unanimously agree that you have a reasonable doubt as to whether the murder was of the first or of second degree, you must give the defendant the benefit of that doubt and return a verdict fixing

36

the murder as of the second degree."  The second gave the same guidance

regarding the distinction between murder and manslaughter verdicts:  "If you are

convinced beyond a reasonable doubt and you unanimously agree that the killing

was unlawful but you unanimously agree that you have a reasonable doubt

whether the crime is murder or manslaughter, you must give the defendant the

benefit of that doubt and find it to be manslaughter rather than murder."

In *People v. Moore* (2011) 51 Cal.4th 386 (*Moore*), decided long after

defendant's trial, we advised that "the better practice is not to use the 1996 revised

versions of CALJIC Nos. 8.71 and 8.72, as the instructions carry at least some

potential for confusing jurors about the role of their individual judgments in

deciding between first and second degree murder, and between murder and

manslaughter.  The references to unanimity in these instructions were presumably

added to convey the principle that the jury as a whole may not return a verdict for

a lesser included offense unless it first reaches an acquittal on the charged greater

offense.  [Citation].  But inserting this language into CALJIC Nos. 8.71 and 8.72,

which address the role of reasonable doubt in choosing between greater and lesser

homicide offenses, was unnecessary, as CALJIC No. 8.75 fully explains that the

jury must unanimously agree to not guilty verdicts on the greater homicide

offenses before the jury as a whole may return verdicts on the lesser."  (*Moore*, at

pp. 411-412.)

We did not hold in *Moore* that the 1996 revised versions of CALJIC Nos.

8.71 and 8.72 were erroneous.  We discussed *People v. Gunder* (2007) 151

Cal.App.4th 412, where the Court of Appeal decided that any confusion arising

from these instructions was dispelled by CALJIC No. 17.40, which tells the jurors

not to " 'decide any question in a particular way because a majority of the jurors,

or any of them, favor that decision.' " (*Moore*, *supra*, 51 Cal.4th at p. 411; see *Gunder*, at p. 425.)[15] Although CALJIC No. 17.40 was also given in *Moore*, we found it unnecessary to decide whether *Gunder* was correct, because any error was harmless beyond a reasonable doubt. The *Moore* jury's true findings on burglary-murder and robbery-murder special circumstances left no room for the lesser offenses of second degree murder and manslaughter. (*Moore*, at p. 412.)

The jury here was also given CALJIC No. 17.40, which stated in relevant part: "The People and the defendant are entitled to the individual opinion of each juror. Each of you must consider the evidence for the purpose of reaching a verdict, if you can do so. Each of you must decide the case for yourself, but should do so only after discussing the evidence and instructions with the other jurors. Do not hesitate to change an opinion if you are convinced it is wrong. However, do not decide any question in a particular way because a majority of the jurors, or any of them, favor that decision." The jury was additionally instructed with CALJIC No. 8.74: "Before you may return a verdict in this case, you must agree unanimously not only as to whether the defendant is guilty or not guilty, but also if you should find him guilty of an unlawful killing, you must agree unanimously as to whether he was guilty of murder of the first degree, murder of the second degree, or voluntary manslaughter." The jury was further told, "you may find it productive to consider and reach a tentative conclusion on all charges and lesser crimes before reaching any final verdict. However, the court cannot accept a guilty verdict on a lesser crime unless you have unanimously found the defendant not guilty of the charged crime." (CALJIC No. 17.10.)

---

[15] As also noted in *Moore*, the *Gunder* court followed its earlier decision in *People v. Pescador* (2004) 119 Cal.App.4th 252, where a different combination of instructions was given. (*Moore*, *supra*, 51 Cal.4th at pp. 410-411.)

Defendant argues that the 1996 revised versions of CALJIC Nos. 8.71 and 8.72 required unanimous agreement on reasonable doubt as to guilt of the greater offense before an individual juror could give him the benefit of the doubt and find him guilty of the lesser. This, he claims, violated his right to due process by reversing the state's burden of proof and making the greater offenses the "default" verdicts. Defendant's interpretation of the instructions is a tortured one. If anything, they skewed the deliberations in his favor. They could reasonably be understood to tell the jurors that if they all agreed there was reasonable doubt as to the degree of the crime, because some jurors were not convinced, then defendant was entitled to the benefit of the doubt and a verdict of the lesser offense. No logical reading of the instructions leads to a compelled verdict of first degree murder.

We did not accept defendant's reading of the instructions in *Moore*, though it was also proposed by the defendant there. (*Moore*, *supra*, 51 Cal.4th at p. 410.) We said only that the instructions created "at least some potential for confusing jurors about the role of their individual judgments in deciding between" the greater and lesser offenses. (*Id.* at p. 411.) While the language to which defendant objects may be confusing because it is unclear how the phrase "unanimously agree that you have a reasonable doubt" applies to individual jurors' views, a reasonable juror in this case, considering the instructions as a whole, would have understood that these terms reflect the principle stated in CALJIC No. 17.10: "the court cannot accept a guilty verdict on a lesser crime unless you have unanimously found the defendant not guilty of the charged crime." (See *Moore*, at p. 411.)

It is a familiar proposition that " '[t]he correctness of jury instructions is to be determined from the entire charge of the court, not from a consideration of parts of an instruction or from a particular instruction.' [Citation.]" (*People v. Hajek and Vo* (2014) 58 Cal.4th 1144, 1220; see *Estelle v. McGuire* (1991) 502

39

U.S. 62, 72 [alleged ambiguity in instructions must be viewed in light of the instructions as a whole and the entire record].) Defendant's reading assumes the jury would disregard not only CALJIC Nos. 8.74 and 17.10, but also the explicit directions of CALJIC No. 17.40 emphasizing each juror's duty to decide the case as an individual. Accordingly, while we have disapproved the unanimity terminology in the 1996 revised versions of CALJIC Nos. 8.71 and 8.72 because of the potential for confusion, the instructions were not erroneous in this case when considered with the rest of the charge to the jury. Defendant's claim of instructional error lacks merit.

Defendant points out that on the third day of deliberations, the jury sent the court a note reading: "Clarification from The Court: What happens if jury is unanimous for verdict of murder but cannot agree on 1st or 2nd degree?" The court, after consulting with counsel and obtaining their approval, responded in writing as follows: "The jury's attention is directed to instruction 8.71 on page 57 of the instructions." Thus, the jury would have read: "If you are convinced beyond a reasonable doubt and you unanimously agree that the crime of murder has been committed by a defendant, but you unanimously agree that you have a reasonable doubt whether the murder was of the first or of the second degree, you must give the defendant the benefit of that doubt and return a verdict fixing the murder as of the second degree." The following day, the jury returned a verdict of first degree murder.

The Attorney General correctly contends that defense counsel's agreement to refer the jury to this instruction forfeited defendant's claim of error on this point. The court noted for the record that "the clerk called counsel and read the proposed response. And counsel agreed that that was an appropriate response." We have held that counsel's affirmative agreement with the court's reply to a note from the jury forfeits a claim of error. (*People v. DeBose* (2014) 59 Cal.4th 177,

40

207.) Here, the court's answer was not responsive to the jury's question. Former CALJIC No. 8.71 did not address the circumstance in which the jury found itself, which was *disagreement* over the degree of murder. But defense counsel did not take the opportunity to suggest an alternative. His endorsement of the court's proposal effectively foreclosed further exploration of possible responses to the jury's question. Therefore, his claim on this point has not been preserved.

On appeal, defendant contends the court should have deleted the references to unanimity, or given the jury CALJIC No. 17.11: "If you find the defendant guilty of the crime of murder, but have a reasonable doubt as to whether it is of the first or second degree, you must find him guilty of that crime in the second degree." But such instruction would have been equally nonresponsive to the jury's concern. Plainly, some jurors had tentatively resolved their doubts in favor of second degree murder, while others leaned in favor of first degree murder. The jury as a whole could not return a verdict on the lesser degree when some jurors were convinced defendant was guilty of the greater. What the jury was conveying to the court was that it was hung on the question of degree. The proper response would have been to direct the jurors to continue deliberating in an effort to achieve unanimity, one way or the other.

### 4. *Other Alleged Instructional Errors*

#### a. *Self-defense*

Defendant claims the self-defense instructions were incomplete because they did not include the principle that " 'where [a] counter assault is so sudden and perilous that no opportunity be given to decline further to fight and [the defendant] cannot retreat with safety he is justified in slaying in self-defense.' " (*People v. Gleghorn* (1987) 193 Cal.App.3d 196, 201; see *People v. Quatch* (2004) 116

41

Cal.App.4th 294, 303.)[16] However, as the *Gleghorn* and *Quatch* courts made clear, this qualification only applies where the defendant commits a simple assault. (*Gleghorn*, at p. 201; *Quatch*, at p. 301.) "[I]f one makes a *felonious* assault upon another, or has created appearances justifying the other to launch a deadly counterattack in self-defense, the original assailant cannot slay his adversary in self-defense unless he has first, in good faith, declined further combat, and has fairly notified him that he has abandoned the affray. (*People v. Hecker* (1895) 109 Cal. 451, 463.)" (*Gleghorn*, at p. 201, italics added.) Here the evidence did not support a finding that defendant was guilty only of simple assault when he initiated the confrontation by approaching the victim with a cocked gun.[17]

### b. *Statements by Defendant*

Defendant also claims the court should have given CALJIC No. 2.71.1, warning the jury to view his statements before the offense with caution.[18] He

---

[16] The jury was given CALJIC No. 5.56, which provides: "The right of self-defense is only available to a person who engages in mutual combat if he has done all the following: One, he has actually tried in good faith to refuse to continue fighting; two, he has clearly informed his opponent that he wants to stop fighting; three, he has clearly informed his opponent that he has stopped fighting; and four, he has given his opponent the opportunity to stop fighting. After he has done these four things, he has the right to self-defense if his opponent continues to fight."

[17] According to defense witness Echeverria, defendant took no part in the assault. Thus, even if this testimony were accepted by the jury, it afforded no basis for the instruction defendant claims should have been given.

[18] The instruction states: "Evidence has been received from which you may find that an oral statement of [intent] [plan] [motive] [design] was made by the defendant before the offense with which [he] is charged was committed. It is for you to decide whether the statement was made by [the] defendant. Evidence of an oral statement ought to be viewed with caution."

We have noted that "[t]he rationale behind the cautionary instruction suggests it applies broadly. 'The purpose of the cautionary instruction is to assist the jury in determining if the statement was in fact made.' [Citation.] This

*(footnote continued on next page)*

42

notes the testimony by Arnold Lemus and Juan Salazar, customers in the Beef Bowl, who said that defendant had "hit them up" and inquired about their gang affiliation; Kathy Mendez's testimony that defendant and Echeverria had spoken about "tak[ing] care of the neighborhood" and not being "caught slipping," as well as her report that defendant had told Echeverria to get the "cuete," meaning his gun; and Patrick Turner's testimony that he heard defendant or Echeverria ask Guevara, "don't I know you from somewhere?"  Defendant also notes Echeverria's testimony that defendant said "Harpys" when Guevara's cousin first got out of the car and entered the Beef Bowl.

In *People v. Diaz* (2015) 60 Cal.4th 1176 (*Diaz*), we reconsidered the requirement that the cautionary principle reflected in CALJIC No. 2.71.1 must be imparted to the jury in any case where the evidence would warrant it.  We decided that "in light of a change in the law that requires the general instructions on witness credibility to be given sua sponte in every case, the cautionary instruction is not one of the general principles of law upon which a court is required to instruct the jury in the absence of a request.  The cautionary instruction does not reflect a legal principle with which jurors would be unfamiliar absent the instruction, and the defendant may not always want the instruction to be given." (*Diaz*, at p. 1189.)  However, we did not decide whether this holding applies retroactively, finding no prejudice to Diaz from the court's failure to give the instruction.  (*Id.* at p. 1195.)  We reach the same conclusion here.

_____

*(footnote continued from previous page)*

purpose would apply to any oral statement of the defendant, whether made before, during, or after the crime." (*People v. Carpenter*, *supra*, 15 Cal.4th at pp. 392-393.)

"We apply the standard for state law error: whether it is reasonably probable the jury would have reached a result more favorable to defendant had the instruction been given. [Citation.] Failure to give the cautionary instruction is not a violation of federal due process warranting the 'more stringent standard' of review for federal constitutional error. [Citation.] 'Since the cautionary instruction is intended to help the jury to determine whether the statement attributed to the defendant was in fact made, courts examining the prejudice in failing to give the instruction examine the record to see if there was any conflict in the evidence about the exact words used, their meaning, or whether the [statements] were repeated accurately.' [Citation.]" (*Diaz*, *supra*, 60 Cal.4th at p. 1195.) "Where there was no such conflict in the evidence, but simply a denial by the defendant that he made the statements attributed to him, we have found failure to give the cautionary instruction harmless." (*People v. Dickey* (2005) 35 Cal.4th 884, 906.) Furthermore, when the general instructions on witness credibility were given, and witnesses were extensively impeached so as to raise the credibility issues to which those instructions were pertinent, we have reasoned that "the jury was unquestionably aware their testimony should be viewed with caution." (*Id*. at pp. 906-907.)

Here there was little conflict in the evidence. Lemus and Salazar agreed on the gist of their conversation with defendant and Echeverria. While Echeverria denied "hitting them up," he admitted that he and defendant "went to go talk to" strangers in the Beef Bowl, and he said these people would have known they were talking to Harpys gang members. The jury was given the standard witness credibility instructions. Mendez, Turner, and Echeverria were each thoroughly cross-examined with reference to their prior statements. There is no reasonable probability that defendant's jury failed to appreciate the need to carefully evaluate

44

their testimony. Accordingly, any error in the failure to give CALJIC No. 2.71.1 was harmless.

### c. *Accessory After the Fact*

The trial court denied defense counsel's request for an instruction on liability as an accessory after the fact, noting that a recent decision by this court had foreclosed instruction on such lesser related offenses. Defendant acknowledges that the court was referring to *People v. Birks* (1998) 19 Cal.4th 108 (*Birks*), in which we discarded the former rule that defendants are entitled to instructions on lesser related offenses. (*Id.* at p. 136, overruling *People v. Geiger* (1984) 35 Cal.3d 510.) However, he claims *Birks* held that trial courts retain discretion to give such instructions, and the trial court erred here by failing to exercise its discretion in that regard. We did not so hold. We noted only that our decision did "not foreclose the parties from agreeing that the defendant may be convicted of a lesser offense not necessarily included in the original charge." (*Birks*, at p. 136, fn. 19.) Here there was no such agreement.

Defendant asks us to reconsider our holding that *Birks* applies retroactively. (*Birks*, *supra*, 19 Cal.4th at pp. 136-137.) We decline to do so. In *Birks* we considered and rejected the argument that our decision should apply only prospectively. "[T]he new rule we announce today neither expands criminal liability nor enhances punishment for conduct previously committed. [Citations.] On the contrary, our holding merely withdraws the procedural opportunity for conviction of a *reduced* offense not encompassed by the accusatory pleading and selected solely by the defendant." (*Birks*, at p. 136; see *People v. Rundle* (2008) 43 Cal.4th 76, 147.)

C. *Penalty Phase Issues*

1. *Echeverria's Manslaughter Conviction as a Mitigating Factor*

Defendant claims he should have been allowed to use Echeverria's manslaughter conviction as a mitigating factor. (See pt. II.B.1., *ante*.) Defense counsel did not seek to introduce that evidence at the penalty phase; thus this claim is forfeited. In any event, it is firmly established that "[t]he sentence received by an accomplice is not constitutionally or statutorily relevant as a factor in mitigation. Such information does not bear on the circumstances of the capital crime or on the defendant's own character and record. '[T]he fact that a different jury under different evidence, found that a different defendant should not be put to death is no more relevant than a finding that such a defendant should be sentenced to death. Such evidence provides nothing more than incomplete, extraneous, and confusing information to a jury, which is then left to speculate [on the matter].' [Citation.]" (*People v. Bemore* (2000) 22 Cal.4th 809, 857; see also, e.g., *People v. Howard*, *supra*, 51 Cal.4th at p. 40.)

2. *Limitation of Witness Testimony*

When questioning defendant's mother, defense counsel asked if she thought defendant should be punished for murdering Guevara, and for his prior murder conviction. She answered, "I wouldn't want him to be punished because I am not certain that he did this, only God knows." Counsel asked, "if it was proven to you that he committed those crimes, do you think he should be punished for those crimes?" She said, "well, let him stay a few years in jail. But please, don't give him the death penalty." Defendant's sister was the next witness. Before she took the stand, the prosecutor approached the bench and questioned whether it was proper for witnesses to be asked about the appropriate sentence. Defense counsel said he did not think he had asked that question. The court said, "Well, I thought it was in a gray area. . . . I think it is permissible for him to say do you want him

46

to die as opposed to should he be executed. That is a fine distinction." The court advised defense counsel to "try to stay away from that area. Just get from her the impact that it has, that [she] loves [her] brother and will visit him in prison and he is a good guy."

Counsel proceeded to ask defendant's sister, "do you feel that he should be punished in any way for what he did?" She answered, "He's my brother. I wouldn't want him to." Counsel repeated the question, and she said, "Give him time in prison but not his whole life and not the death penalty." The prosecutor did not object.

Defendant contends the court's limitation on questioning violated his right under the Eighth and Fourteenth Amendments to present mitigating evidence. The claim lacks any foundation in the record. Counsel never sought to ask any witness about the appropriate sentence. He asked both witnesses the same general question about whether defendant should be punished, and their answers were admitted into evidence. Counsel gave no indication that he wanted to pursue any further questioning along these lines. Defendant argues that the following witness, a friend of defendant's, was not asked any questions about the appropriate sentence. However, given that counsel had freely questioned defendant's sister about her views on punishment, after hearing the court's advice on the matter, there is no basis for concluding that counsel's questioning of the next witness was unduly restricted.

### 3. *The Prosecutor's Argument*

At the outset of his closing statement the prosecutor told the jury: "One of the most important things to keep in mind is that this whole process, the whole trial process, the penalty phase process, the reason why you are here and [defense counsel] is here is essentially a truth-seeking mission. It is to evaluate the facts

and determine what is true and what isn't true and what to do with those facts once you make that determination.

"The judge talked to you at the beginning of this trial about the death penalty, about what would take place in the penalty phase and your job evaluating the mitigating factors versus the aggravating factors. As the judge told you, there is no burden of proof but there is a standard to be applied with the aggravating factors and the mitigating, that . . . the aggravating substantially outweigh those mitigating factors. That is something that you need to decide when you go back to deliberate."

Defendant notes that we have repeatedly characterized the jury's function at the penalty phase as "inherently moral and normative, not factual." (*People v. Rodriguez* (1986) 42 Cal.3d 730, 779; see also, e.g., *People v. Wilson* (2008) 44 Cal.4th 758, 830.) Accordingly, he claims it was misconduct for the prosecutor to describe the penalty phase as "essentially a truth-seeking mission." No objection was made below, and this claim is thus forfeited. " 'In order to preserve a claim of misconduct, a defendant must make a timely objection and request an admonition; only if an admonition would not have cured the harm is the claim of misconduct preserved for review.' [Citation.] When a claim of misconduct is based on the prosecutor's comments before the jury, ' "the question is whether there is a reasonable likelihood that the jury construed or applied any of the complained-of remarks in an objectionable fashion." ' " (*People v. Friend* (2009) 47 Cal.4th 1, 29; accord, *People v. Gonzales* (2012) 54 Cal.4th 1234, 1294.) Here, any prejudice to defendant could easily have been dispelled by an admonition from the bench.

In any event, there is no reasonable likelihood the jury was misled by the prosecutor's comments. In context, they merely informed the jurors that it was their job to decide "what to do with those facts" they had found to be true, by

48

weighing the factors in aggravation and mitigation.  The prosecutor also emphasized that it was for the jury to decide how much weight to give the aggravating and mitigating factors.  That was clearly not a matter of truth or falsity.  Defendant's claim of misconduct is meritless as well as forfeited.

    4. *Failure to Instruct on Prior Conviction as an Aggravating Factor*

  Defendant claims his prior murder conviction was improperly used both as a special circumstance under section 190.2, subdivision (a) and as an aggravating factor under section 190.3, factors (b) and (c).  He contends the jury should have been instructed not to "double count" the conviction in this fashion.  He acknowledges that in *People v. Proctor* (1992) 4 Cal.4th 499, 550 (*Proctor*), we held such an instruction is only available upon request, but asks us to reconsider that rule and hold the instruction must be given whenever the evidence raises the possibility of improper double counting.

  To the extent defendant argues that the same incident may not be considered as a special circumstance and as an aggravating factor, he is incorrect. (*People v. Ray* (1996) 13 Cal.4th 313, 323; *People v. Stanley* (1995) 10 Cal.4th 764, 820-821.)  To the extent he argues that an instruction on double counting an aggravating factor is required in the absence of a request, we are not persuaded to change our settled view.  (*Proctor*, *supra*, 4 Cal.4th at p. 550, citing *People v. Ashmus* (1991) 54 Cal.3d 932, 997; *People v. Morris* (1991) 53 Cal.3d 152, 224; and *People v. Melton* (1988) 44 Cal.3d 713, 768; see *McKinnon*, *supra*, 52 Cal.4th at pp. 694-695.)

5. *Challenges to the Death Penalty Statute*

Defendant raises a series of constitutional challenges to the death penalty statute, all of which we have rejected in past cases. We do so again here.[19]

"The death penalty law adequately narrows the class of death-eligible defendants. [Citations.]" (*People v. Boyce* (2014) 59 Cal.4th 672, 723 (*Boyce*); see also, e.g., *People v. Linton* (2013) 56 Cal.4th 1146, 1214 (*Linton*).)

" 'The sentencing factor of "circumstances of the crime" (§ 190.3, factor (a)) is not unconstitutionally vague and does not result in the arbitrary and capricious imposition of the death penalty.' [Citation.]" (*People v. Scott* (2015) 61 Cal.4th 363, 407 (*Scott*); see also, e.g., *People v. Merriman* (2014) 60 Cal.4th 1, 105-106.)

" 'Neither the federal nor the state Constitution requires that the penalty phase jury make *unanimous* findings concerning the particular aggravating circumstances, find all aggravating factors *beyond a reasonable doubt*, or find beyond a reasonable doubt that the aggravating factors *outweigh* the mitigating factors. [Citation.] The United States Supreme Court's recent decisions interpreting the Sixth Amendment's jury-trial guarantee [citations] do not alter these conclusions. [Citations.]

"Neither the cruel and unusual punishment clause of the Eighth Amendment, nor the due process clause of the Fourteenth Amendment, requires that jurors in a capital case be instructed that they must find beyond a reasonable doubt that aggravating circumstances exist or that aggravating circumstances

---

**19** We need not address defendant's claim that the use of unadjudicated criminal activity as an aggravating factor violated his constitutional rights. The only prior criminal activity introduced at the penalty phase was defendant's earlier murder, which was adjudicated.

50

outweigh mitigating circumstances or that death is the appropriate penalty. [Citations.] Indeed, trial courts 'should not instruct the jury regarding any burden of proof or persuasion at the penalty phase.' [Citation.] ' "Unlike the guilt determination, 'the sentencing function is inherently moral and normative, not factual' [citation] and, hence, not susceptible to a burden-of-proof quantification." ' [Citation.]" (*Linton*, *supra*, 56 Cal.4th at pp. 1215-1216; see also, e.g., *Boyce*, *supra*, 59 Cal.4th at pp. 723-724.)

"We have consistently held that the 'so substantial' language in CALJIC No. 8.88 'is not inadequate or misleading. By advising that a death verdict should be returned only if aggravation is "so substantial in comparison with" mitigation that death is "warranted," the instruction clearly admonishes the jury to determine whether the balance of aggravation and mitigation makes death the appropriate penalty.' [Citations.]" (*People v. Russell* (2010) 50 Cal.4th 1228, 1273; see also, e.g., *Boyce*, *supra*, 59 Cal.4th at p. 724.)

"The trial court is not required to instruct the jury that the absence of a mitigating factor cannot be considered as an aggravating factor [citation], [nor is it error] to instruct the jury with CALJIC No. 8.85 without deleting inapplicable factors [citation]." (*McKinnon*, *supra*, 52 Cal.4th at p. 692; see also, e.g., *Scott*, *supra*, 61 Cal.4th at p. 407.)

"Neither federal nor state law requires the court to give a lingering doubt instruction because this 'concept is encompassed in section 190.3, factor (k) and related [standard capital case] instructions.' [Citation.]" (*Scott*, *supra*, 61 Cal.4th at p. 408; see also, e.g., *People v. Gonzales and Soliz*, *supra*, 52 Cal.4th at pp. 325-326.)

"CALJIC No. 8.88's language instructing the jury 'to consider whether the circumstances "warrant[ ]" death, rather than if death is the "appropriate" penalty,'

51

does not violate the Eighth and Fourteenth Amendments. [Citation.]" (*Boyce*, *supra*, 59 Cal.4th at p. 724; see also, e.g., *McKinnon*, *supra*, 52 Cal.4th at p. 693.)

"The trial court is not required to instruct the jury . . . that if the mitigating evidence outweighs the aggravating evidence, the jury must return a verdict of life without the possibility of parole [citation] . . . ." (*Scott*, *supra*, 61 Cal.4th at p. 407; see also, e.g., *Boyce*, *supra*, 59 Cal.4th at p. 724.)

"The trial court was not required to instruct the jury that the defendant bears no burden to prove mitigating factors or that it need not be unanimous in finding the existence of any mitigating factor. [Citations.]" (*People v. Adams* (2014) 60 Cal.4th 541, 580; see also, e.g., *People v. Brasure*, *supra*, 42 Cal.4th at pp.1068-1069.)

"Defendant was not entitled to an instruction that there is a presumption in favor of life without parole. [Citation.]" (*Boyce*, *supra*, 59 Cal.4th at p. 724; see also, e.g., *Scott*, *supra*, 61 Cal.4th at p. 407.)

"Written findings by the jury are not constitutionally required. [Citation.]" (*Scott*, *supra*, 61 Cal.4th at p. 407; see also, e.g., *Boyce*, *supra*, 59 Cal.4th at pp. 724-725.)

" 'Intercase proportionality review is not required.' [Citation.] 'The California death penalty scheme does not violate equal protection by treating capital and noncapital defendants differently.' [Citation.] '. . . California's death penalty scheme does not violate international law and norms.' [Citation.]" (*Scott*, *supra*, 61 Cal.4th at p. 408; see also, e.g., *Boyce*, *supra*, 59 Cal.4th at p. 725.)

D. *Cumulative Prejudice*

Defendant contends the cumulative effect of errors at all phases of his trial requires reversal of the guilt and penalty judgments. We disagree. Pretrial, the court erred by failing to conduct death-qualification voir dire of three prospective

jurors, but defendant forfeited his claim on this point by failing to object. Counsel's neglect leaves us with no record to support his assertion of prejudice.

At the guilt phase, we have found no prejudicial error. We have rejected defendant's claims of penalty phase error. Accordingly, the claim of cumulative prejudice fails.

## III.  DISPOSITION

The judgment is affirmed.

**CORRIGAN, J.**

**WE CONCUR:**

**CANTIL-SAKAUYE, C. J.**
**WERDEGAR, J.**
**CHIN, J.**
**LIU, J.**
**CUÉLLAR, J.**
**KRUGER, J.**

**CONCURRING OPINION BY CUÉLLAR, J.**


A core premise of our legal system, grounded in our basic charters of governance, is that society distinguishes between juveniles and adults who commit crimes. (E.g., *Miller v. Alabama* (2012) 567 U.S. _, ___ [132 S.Ct. 2455, 2464] (*Miller*) ["children are constitutionally different from adults for purposes of sentencing"]; see *Manduley v. Superior Court* (2002) 27 Cal.4th 537, 548 [discussing differential treatment of juveniles and adults].) We draw such a distinction not only in the general domain of criminal sentencing, but in the specific context of the death penalty. (E.g., *Roper v. Simmons* (2005) 543 U.S. 551 (*Roper*) [federal Const. precludes a death sentence for individuals who committed their crimes when under the age of 18]). In light of the lines courts have drawn to distinguish between juvenile and adult conduct for sentencing purposes — and, in particular, the limitations on imposition of the death penalty for conduct an individual committed as a juvenile — defendant Magdaleno Salazar argues that the Eighth Amendment to the United States Constitution bars imposition of the death penalty in this case. Specifically, he claims that the federal Constitution prohibits use of his prior juvenile murder conviction as the sole basis for the special circumstance that made his first degree murder punishable by death.

The majority opinion rejects this argument. Although I concur with this conclusion, I write separately to address certain aspects of this claim and explain why the question is a close one.

A court or jury may consider a defendant's prior murder, even if committed when defendant was a minor, as an aggravating circumstance. (*People v. Bivert* (2011) 52 Cal.4th 96, 122-123, and cases cited therein.) What defendant contends is that use of his prior juvenile murder conviction for the *eligibility* determination is different. It is, in some respects, since the purpose of eligibility factors is to narrow the universe of individuals punishable by death. (See *Romano v. Oklahoma* (1994) 512 U.S. 1, 7.) In *Roper*, *supra*, 543 U.S. at page 569, the United States Supreme Court held that individuals who are under 18 when they commit murder "cannot with reliability be classified amongst the worst offenders" who deserve execution. The court identified three differences between juveniles and adults in support of this conclusion. First, juveniles' immaturity and lesser sense of responsibility often result in " 'impetuous and ill-considered actions and decisions.' " (*Ibid.*) Second, juveniles are more vulnerable to negative influences and outside pressures. (*Ibid.*) Third, juveniles have character traits that tend to be more malleable, and may prove less accurate as portents of future conduct. (*Id.* at p. 570.) In light of these differences, the court concluded that juveniles are categorically less culpable than adults. (*Id.* at p. 561.)

Defendant urges us to build on this foundation. It is impossible, he claims, to reconcile two conclusions: that such differences make juveniles categorically less culpable than adults, and that a court may nonetheless rely on a juvenile offense to establish a defendant's eligibility for a death sentence. Indeed, it is "analytically incoherent," defendant contends, to conclude that conduct presumed to be less culpable because it was committed during his youth (see *Roper*, *supra*, 543 U.S. at p. 569) could nevertheless establish a special circumstance, thereby making it possible for him to receive the death penalty. If a juvenile offender is categorically less culpable than an adult offender committing an equivalent offense, defendant questions how the Eighth Amendment permits an offense

2

committed by a juvenile to play precisely the same role in constituting the basis for a special circumstance as an offense committed by an adult.

In light of the high court's decisions concerning the punishment of juvenile offenders (e.g., *Miller*, *supra*, 567 U.S. __ [132 S.Ct. 2455] [Eighth Amend. forbids mandatory life imprisonment without possibility of parole (LWOP) sentences for murder committed by a juvenile]; *Graham v. Florida* (2010) 560 U.S. 48 [Eighth Amend. forbids LWOP sentences for non-homicide crimes committed by juveniles]; *Roper*, *supra*, 543 U.S. 551), I find the question to be a difficult one. There is at least some tension between our jurisprudence concerning the culpability of juveniles (see, e.g., *People v. Gutierrez* (2014) 58 Cal.4th 1354, 1375; *People v. Caballero* (2012) 55 Cal.4th 262, 266) and the idea that a murder committed by a juvenile is no different from any other murder for purposes of applying the relevant special circumstance here. (Pen. Code, § 190.2, subd. (a)(2); subsequent unlabeled statutory references are to the Penal Code.) Moreover, the relevant analysis of defendant's claim turns not only on what is rational for a Legislature to conclude, but also on what constitutes permissible punishment under the Eighth Amendment. For example, it might conceivably be "rational" for the Legislature to conclude that juveniles who commit multiple murders should receive mandatory LWOP sentences — but that is a scheme the Eighth Amendment plainly forbids. (*Miller*, *supra*, 567 U.S. __ [132 S.Ct. 2455].)

By embracing defendant's claim, we would perforce embrace the conclusion that there is no way to reconcile the Legislature's approach to special circumstances with the requirements of the Eighth Amendment. What nonetheless seems quite relevant to the inquiry — and cuts against defendant's argument — is that section 190.2, subdivision (a)(2) *does* serve to narrow the class of individuals eligible for imposition of the death penalty. Under this statutory provision, a narrower class of individuals is eligible for capital punishment relative to the full

3

range of individuals who commit a first degree murder — and even relative to individuals who previously committed a murder as juveniles. The latter narrowing occurs under section 190.2, subdivision (a)(2) because only juvenile murders that result in criminal convictions, rather than juvenile adjudications, satisfy the special circumstance. (§ 190.2, subd. (a)(2) [requiring that defendant previously was "convicted" of first or second degree murder]; *In re W.B.* (2012) 55 Cal.4th 30, 43 [juvenile adjudication is not a conviction].) The distinctions drawn in application of the special circumstance reflect an aspect of the legislative design that is not plainly ruled out by the Eighth Amendment. (*Coker v. Georgia* (1977) 433 U.S. 584, 592 [describing the circumscribed scope of Eighth Amend. review].) Defendant is right that special circumstances and aggravating factors serve different functions. (*Tuilaepa v. California* (1994) 512 U.S. 967, 971-972.) Yet ultimately, defendant's argument fails to distinguish sufficiently between the permissible use of his prior juvenile murder as an aggravating circumstance and its allegedly improper use as a special circumstance.

**CUÉLLAR, J.**

4

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** People v. Salazar

_____

**Unpublished Opinion**
**Original Appeal** XXX
**Original Proceeding**
**Review Granted**
**Rehearing Granted**

_____

**Opinion No.** S077524
**Date Filed:** May 26, 2016

_____

**Court:** Superior
**County:** Los Angeles
**Judge:** Robert J. Perry

_____

**Counsel:**

Michael J. Hersek, State Public Defender, under appointment by the Supreme Court, Jessica K. McGuire, Assistant State Public Defender, Jolie S. Lipsig and Ellen J. Eggers, Deputy State Public Defenders; James S. Thomson and Nicholas J. Seymour for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette and Gerald A. Engler , Chief Assistant Attorneys General, Lance E. Winters, Assistant Attorney General, Joseph P. Lee, Jaime L. Fuster and Ryan M. Smith, Deputy Attorneys General, for Plaintiff and Respondent.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

James S. Thomson
819 Delaware Street
Berkeley, CA  94710
(510) 525-9123

Ryan M. Smith
Deputy Attorney General
300 South Spring Street, Suite 1702
Los Angeles, CA  90013
(213) 897-2712