Filed 10/17/24  P. v. Fagan CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>DAVID DANIEL FAGAN,<br><br>    Defendant and Appellant. | F087608<br><br>(Super. Ct. No. SF011641A)<br><br><br>**OPINION** |

## THE COURT[*]

APPEAL from a judgment of the Superior Court of Kern County.  Kenneth C. Twisselman II, Judge.

Stephanie A. Gunther, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Louis M. Vasquez, Amanda D. Cary and William K. Kim, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

---

[*]    Before Detjen, Acting P. J., Peña, J. and Meehan, J.

In 2004, defendant David Daniel Fagan was convicted of first degree murder and sentenced to 57 years to life in prison. This sentence included a one-year prior prison term enhancement. Following enactment of Penal Code section 1172.75,[1] the trial court recalled defendant's sentence and struck the prior prison term enhancement but denied defendant's *Romero*[2] motion. On appeal, defendant argues that the court abused its discretion in denying the motion. The People disagree. We affirm.

## PROCEDURAL HISTORY[3]

On January 20, 2004, the Kern County District Attorney filed an information charging defendant with first degree murder (§ 187, subd. (a); count 1). The information also alleged that, in the commission of the offense, defendant personally used a deadly weapon (§ 12022, subd. (b)(1)), had suffered two prior serious felony convictions (§ 667, subd. (a)), had suffered two prior strike convictions within the meaning of the "Three Strikes" law (§§ 667, subds. (c)–(j), 1170.12, subds. (a)–(e)), and had served a prior prison term for a conviction other than a specified violent felony conviction (§ 667.5, former subd. (b)).

On May 25, 2004, a jury found defendant guilty of first degree murder. The jury also found true one prior serious felony conviction allegation, one prior strike conviction allegation, the prior prison term allegation, and that defendant personally used a deadly weapon.

On July 6, 2004, the trial court sentenced defendant to an aggregate term of 57 years to life. This term consisted of 50 years to life for first degree murder (the sentence was doubled due to the prior strike conviction); one year for the personal use of

---

[1] All further undesignated statutory references are to the Penal Code.

[2] *People v. Superior Court* (*Romero*) (1996) 13 Cal.4th 497 (*Romero*).

[3] We were not provided the full record from the 2004 proceedings. However, there is no dispute regarding the procedural history of this case.

2.

a deadly weapon enhancement; five years for the prior serious felony conviction enhancement; and one year for the prior prison term enhancement.

On January 18, 2024, the trial court held a resentencing hearing pursuant to section 1172.75. The court struck the personal use of a deadly weapon enhancement, the prior serious felony conviction enhancement, and the prior prison term enhancement. However, the trial court denied defendant's motion to strike the prior strike conviction pursuant to *Romero* and sentenced defendant to 50 years to life.

On February 9, 2024, defendant timely filed a notice of appeal.

## FACTUAL SUMMARY[4]

"At 10:00 a.m. on September 2, 2003, correctional officers at Wasco State Prison observed inmate Richard Zavala go down on one knee and fall on his side in the yard of the facility. Sergeant Robert Mosley was seated at his desk in the prison program office. He was able to see the prison yard, which was occupied by 10 to 12 inmates rather than the usual 100. Mosley instructed Correctional Officer James Wilbanks to make sure Zavala was all right.

"Officer Wilbanks initially walked in Zavala's direction and then ran when he saw Zavala in distress. When Wilbanks reached Zavala he observed blood 'gushing out' of Zavala's head and covering his face. The top of Zavala's cranium was crushed in the form of 'the top portion of a [baseball] bat.' No one was near Zavala and Wilbanks twice asked Zavala who hit him. Zavala was conscious but did not answer the officer's question and instead responded, '[W]ho are you?'

"Correctional Officer Anthony Sandoval found a baseball bat near Zavala and took it into custody. Sandoval did not see any blood on the bat. Two hours after the incident, Correctional Officer Steve Riley found a blood-smeared baseball bat stored with the athletic equipment in the prison recreation room. At trial, the parties stipulated that Mark Riehle, a member of the Kern County Sheriff's Department Technical Investigations Unit, analyzed the two baseball bats for the presence of fingerprints but found no

---

[4] On this court's own motion, we take judicial notice of the prior opinion in *People v. Fagan* (Aug. 22, 2005, F045937) [nonpub. opn.], pursuant to Evidence Code sections 452, subdivision (d) and 459. Our court summarized the facts underlying the conviction in defendant's prior appeal and we use that same summary here.

usable fingerprints on either bat.  The parties also stipulated that Brenda Smith, a criminalist with the Kern County Regional Crime Laboratory, conducted DNA analysis on the wide portion of the blood-smeared bat and determined the DNA in the blood belonged to victim Zavala.

"Billy Whitten was an inmate at Wasco State Prison on the day of the incident and testified after being granted use immunity.  He admitted he was serving time for a parole violation following a conviction for assault with great bodily injury and was housed in the minimum security unit at Wasco.  At the time of the incident, Whitten was walking the track of the minimum security, Level One yard of the prison.  At the same time, [defendant] was playing baseball with an inmate known as 'Shorty' behind one of the prison buildings.  Whitten saw Zavala walk out of the building and smoke a cigarette.  Whitten knew Zavala, whose prison nickname was 'Train.'  From a distance of 27 feet, Whitten saw [defendant] hit Zavala in the head three times with a baseball bat.  Whitten also said the bat resembled the blood-smeared baseball bat secured by Officer Riley.

"Whitten did not report the incident on the day it occurred.  He later spoke to Correctional Lieutenant Richard Christensen and said another inmate named Medina had also hit Zavala with the baseball bat.  According to Whitten, yet another inmate, named Big Ray, had been with Zavala before the incident and Whitten thought Big Ray had 'bust' Zavala in the mouth (although he was not sure of this).  Whitten said a few days before this incident, some of Zavala's friends had beaten up an inmate named Johnny multiple times.  Zavala was present for one of those beatings.

"Ray Briones was an inmate at Wasco State Prison in September 2003 and was present on the day of the incident.  Briones was acquainted with [defendant], who was nicknamed 'Buck,' but they were not friends.  Briones had numerous prior felony convictions and said he was a member of the Southside Gang, a prison gang comprised of Hispanics from Southern California.  According to Briones, the Southside [G]ang operates both inside and outside of prison.  Briones said [defendant] and Zavala were also members of that gang.  Zavala, formerly of Orange County, was the 'head' or leader of the pack of the minimum security, Level One yard as well as a leader of the entire gang.  In contrast, Briones and [defendant] were from Los Angeles and were only soldiers, not leaders, of the gang.

"Briones testified the members of the Southside Gang at Wasco had a meeting a few days before the incident.  Both [defendant] and Briones attended the meeting, which was held in the early evening.  Zavala came by the meeting, said he knew people were mad, and told them to keep the

4.

peace.  The meeting took place because Zavala had previously instructed [defendant] to bring a friend named Johnny Nielsen to a specific place in the prison facility.  When [defendant] complied, Zavala had some confederates—a 'wrecking crew'—subject Nielsen to several beatings.  At the subsequent meeting, gang members were upset because Nielsen was from Los Angeles and [defendant] did not intervene or try to help Nielsen when the beating began.  They were particularly upset because Zavala had tricked [defendant] into bringing his 'partner'—Nielsen—to a specified area of the prison for a beating by the wrecking crew.  Briones explained that by not helping Nielsen, [defendant] made Southsiders from Los Angeles 'look bad on the yard' when compared with Southsiders from Orange County and the Inland Empire.  At the meeting, [defendant] initially tried to explain his conduct and ultimately said he would 'take care of it.'  However, he did not offer any details.

"On the morning of the incident, Briones asked Zavala to sell him some marijuana.  Zavala suggested they go outside to talk about the transaction.  They went to the prison baseball field where [defendant], an inmate named Carroll, and a third inmate were playing baseball.  Briones bought the marijuana and smoked some with Zavala.  When [defendant] asked if he could have a 'hit' of the marijuana, Zavala agreed, saying, '[Y]eah, come on down.'  Zavala handed the cigarette to [defendant], who had a baseball bat in his hand at the time.  [Defendant] and Zavala then started speaking about the beating of Nielsen.  Briones said he knew something was going to happen and started to leave the area.

"While his back was turned to his fellow inmates, Briones heard a thump that sounded like a bat striking a watermelon.  Briones turned around and saw that Zavala had been hit in the face and his glasses had been shattered.  Zavala fell and [defendant] hit him three more times with the baseball bat, even though Briones told [defendant] to leave him alone.  Briones thought [defendant] was going to hurt Zavala but not kill him.  Briones also thought that [defendant's] conduct was too harsh a punishment for a fellow Southsider.  When Briones went to report the incident, another inmate with a bat came over, told him he did not see anything, and instructed him to back away because the dispute involved Southside business.  Although Briones testified he did not hit Zavala with a bat or his fists, Briones did tell Correctional Captain Speer, 'There's only one dude I seen.  And then, like, right when I hit that fool, that was it.'

"Danny Carroll was an inmate at Wasco State Prison on the date of the incident and received immunity for his testimony.  On September 2, 2003, he saw Zavala in a pool of blood on the ground of the yard.  He did

not see anyone hit Zavala and did not see [defendant] hit Zavala with a bat. Carroll told Lieutenant Christensen he did not see anyone hit Zavala with a bat.

"Lieutenant Christensen investigated the death of Zavala and twice spoke to inmate Carroll.  Carroll said on the day of the incident he was playing baseball with [defendant] in the yard while Zavala and Briones were speaking with one another.  [Defendant] went over to the pair and started to hit Zavala with a bat he was holding.  An inmate named Arguela went over to Briones and began yelling, 'Southside.'  Carroll repeated this version of events in a second interview with Christensen.  The latter said Carroll offered inconsistent statements in which he minimized his involvement, said he got chased, and claimed he did not see what happened.

"Antonio Alvarez was also an inmate at Wasco State Prison on the date of the incident and testified under a grant of use immunity.  Alvarez said [defendant] did not ask him to help beat up Zavala sometime prior to the incident.  Alvarez denied telling Lieutenant Christensen that he had such a conversation with [defendant].  Christensen contradicted Alvarez, said he had spoken with Alvarez one week after the incident, and that [defendant] said he was going to get back at Zavala and wanted Alvarez to help him.  Alvarez told Christensen he declined, explaining he was going to be paroled soon.  According to Alvarez, [defendant] never said he was going to attack Zavala with a baseball bat or that he was going to kill Zavala.  Christensen asked Alvarez if he saw the attack on Zavala but Alvarez said he did not.

"Raffi Kartalian, M.D., was working as an emergency room resident at Kern Medical Center in Bakersfield in September 2003.  He initially treated Zavala on the morning of the incident.  Dr. Kartalian said paramedics transported Zavala to the emergency room.  He was alive upon arrival and had a spontaneous heart beat and respiration.  However, he had multiple injuries to the face, eyes, skull, and scalp.  Zavala made no coherent sounds, did not open his eyes to verbal or painful stimuli, and did not move his extremities in any meaningful way.  From the emergency room, Zavala was admitted to the intensive care unit for trauma surgery service.

"Francesca Hoehne, M.D., was working as a surgical resident in trauma service at Kern Medical Center in September 2003.  She treated Zavala on the morning of the incident.  He arrived in the Level Two trauma center with large lacerations to his head and face, particularly the nose and mouth areas.  Zavala was able to communicate but his breathing was very

slow.  The trauma center staff stapled Zavala's head wounds to control the profuse bleeding.  A CAT scan of Zavala's head revealed extensive facial fractures of the maxillary sinuses and a nasal fracture.  He also had a questionable vertex epidural hematoma (a collection of blood in the brain).  The stapling did not effectively close Zavala's head lacerations and he was taken to an operating room for further suturing.

"Murali Naidu, M.D., was working as a surgical resident at Kern Medical Center in September 2003.  Dr. Naidu testified he treated Zavala early on the morning of September 3 and that Zavala took a turn for the worse that evening.  At that time, the neurosurgical staff informed Dr. Naidu that Zavala had tested positive for brain death.  Zavala was taken off of life support and Dr. Naidu pronounced him dead at 9:41 p.m.

"Thomas Volk, M.D., a forensic pathologist, performed an autopsy on Zavala's body the next day.  Dr. Volk concluded Zavala had severe brain damage and, as a result, his heart and respiratory system failed.  In reaching this conclusion, Dr. Volk noted:

'… There was about a four or five inch fracture across the left side of [Zavala's] forehead, just above the eyebrow, behind the laceration I described.  There was a rather large fracture beginning on the left side of the face of the head or on the temporal region, front of the ear, extending around back behind the head, around the back of the head and then going forward to the base of the skull.  And then there were multiple other small pieces of bone fractured over the left side of the head, much as if you had mashed a hard boiled egg, sort of.'

Dr. Volk concluded that Zavala had been struck with a blunt object.

"**Defense**

"Antonio Alvarez also testified as a witness for the defense.  He was working on a landscaping crew outside the prison yard at the time of the attack on Zavala.  Alvarez claimed the correctional officers who interviewed him threatened to keep him in prison 'forever' unless he agreed with their version of events.  Alvarez testified that [defendant] never said he was going to attack Zavala, never said Zavala was going to be attacked with a baseball bat, and never said that Zavala was going to be attacked in any way.

"Danny Samaro, nicknamed 'D,' testified he was an inmate at Wasco State Prison in September 2003 and was housed in the minimum security Yard E portion of the complex.  Samaro said he was a friend of

Richard Zavala and smoked a cigarette with him at 6:00 a.m. on the day of the incident. The pair smoked outside a back corner of the E-2 Building. They smoked in the presence of two fellow inmates nicknamed 'Bad Ass' and 'Ag Dog.' At 7:30 a.m., Samaro left the E Yard to shower for a medical appointment in the main prison facility. Samaro never saw Ray Briones in Richard Zavala's presence that morning." (*People v. Fagan*, *supra*, F045937, fns. omitted.)

## DISCUSSION

### I. Additional Background

On October 4, 2023, defendant, through counsel, filed a petition for resentencing pursuant to section 1172.75. On January 11, 2024, defendant filed a sentencing statement. Defendant asked the trial court to strike his prior strike conviction pursuant to *Romero* because he "has been working to change his life" and "is now a changed man." In support, defendant provided, inter alia, letters from his parents and Rev. Dr. Vance Nilsen; evidence that he received an Associate of Arts degree in Pastoral Ministry from Thornwell Presbyterian Divinity College; and evidence that he successfully completed rehabilitative courses and programs, such as the "Getting Out by Going In" group certificate course and the basic and advanced courses in nonviolent conflict resolution. Defendant also noted that even if the trial court struck the strike, he would still be sentenced to a term of 25 years to life on count 1.

The trial court held the resentencing hearing on January 18, 2024. At the outset, the court noted that it "read and considered the updated presentence report by Probation that is dated November 21, 2023; also, the original report, which was filed back on July 6th, 2004; also, a sentencing statement submitted by defense counsel that has numerous attachments, which are positive information about … defendant's progress, letters from both his mother and father addressing progress they believe he's made while in custody."

After hearing arguments from the parties, the trial court ruled as follows:

8.

"I'm considering under the case law that helps guide the Court in exercising its discretion pursuant to [section] 1385, including the *Romero* decision. There's [*sic*] many other cases to help guide us. We're looking at all the different factors involving … defendant, the crime, his criminal history, all the individualized characteristics of … defendant. The question is does he fall outside the scheme of the Three Strikes Law? And although—his last two felonies before the murder that caused him to be sentenced in the current case, even they were drug related. After the 1997 conviction and his prison commitment, he violated parole twice upon his release from custody. And then the last time he was committed to [the Department of Corrections and Rehabilitation] prior to this case, he had only been—he hadn't become eligible for parole, I assume, before the current offense was committed in prison, a horrific crime, beating a fellow inmate to death with a baseball bat.

"So considering all the different circumstances, I appreciate the progress that it would appear that [defendant] has been making, but that's not enough to cause the Court to find he falls outside the scheme of the Three Strikes Law and the *Romero* motion is denied."

Later at the same hearing, the trial court stated:

"I … find circumstances in mitigation. One, … defendant's prior performance under parole from 1994 to 1997 was satisfactory; two, multiple enhancements are alleged in a single case. The enhancement is based on a prior conviction over five years old, referring to the [section] 667[, subdivision] (a) prior conviction. Circumstances in aggravation, one, his prior convictions as an adult are numerous; two, his prior performance on felony probation and parole was unsatisfactory because of the re-offending; and three, he has served a prior prison term.

"I'll note that the probation officer did request an update on … defendant's postconviction conduct and has received no information to provide to the Court."

## II.   Applicable Law

A trial court has discretion to dismiss a prior strike conviction alleged under the Three Strikes law if the dismissal is in the furtherance of justice, "subject … to strict compliance with the provisions of section 1385 …." (*Romero*, *supra*, 13 Cal.4th at p. 504; § 1385, subd. (a).)  "[T]he underlying purpose of striking prior conviction allegations is the avoidance of unjust sentences."  (*People v. Garcia* (1999) 20 Cal.4th

9.

490, 500.) In exercising its discretion, the trial court "must consider whether, in light of the nature and circumstances of his present felonies and prior serious and/or violent felony convictions, and the particulars of his background, character, and prospects, the defendant may be deemed outside the scheme's spirit, in whole or in part, and hence should be treated as though he had not previously been convicted of one or more serious and/or violent felonies." (*People v. Williams* (1998) 17 Cal.4th 148, 161.) These are "stringent standards." (*People v. Carmony* (2004) 33 Cal.4th 367, 377 (*Carmony*).)

## III. Standard of Review

We review the denial of a motion to dismiss prior strike convictions for abuse of discretion. (*Carmony*, *supra*, 33 Cal.4th at p. 374.) The Three Strikes law establishes that not dismissing a prior strike conviction is the "norm," and there is a "strong presumption that any sentence that conforms to these sentencing norms is both rational and proper." (*Id*. at p. 378.) Abuse of discretion in failing to dismiss a prior strike conviction occurs in limited circumstances, such as where the trial court was not aware of its discretion; where the trial court considered impermissible factors; or where applying the Three Strikes law would, as a matter of law, " 'produce[] an "arbitrary, capricious or patently absurd" result' under the specific facts of a particular case." (*Ibid*.) Additionally, abuse of discretion occurs when the trial court's findings of fact are not supported by substantial evidence. (*Haraguchi v. Superior Ct.* (2008) 43 Cal.4th 706, 711.) Substantial evidence is " 'evidence that is reasonable, credible, and of solid value ….' " (*People v. Cravens* (2012) 53 Cal.4th 500, 507; *People v. Reyes* (2023) 14 Cal.5th 981, 988.)

## IV. Analysis

Defendant argues that the trial court abused its discretion in denying his *Romero* motion. Defendant bases much of his argument on the assertion that the court failed to adequately consider his character and prospects, specifically his rehabilitative efforts

10.

while in prison and that he had been crime free for approximately 20 years. Defendant also relies heavily on *People v. Avila* (2020) 57 Cal.App.5th 1134.

Contrary to defendant's assertion, the trial court adequately considered defendant's character and prospects. At the resentencing hearing, the court noted that it reviewed relevant documents, including defendant's sentencing statement and the attached documents. In making its ruling, the court stated it considered, among other things "all the individualized characteristics of … defendant." While the court "appreciate[d] the progress that it would appear that [defendant] ha[d] been making," that progress was "not enough to cause the Court to find he falls outside the scheme of the Three Strikes Law." Additionally, prior to sentencing defendant, the court noted that "the probation officer did request an update on … defendant's postconviction conduct [from the Department of Corrections and Rehabilitation] and has received no information to provide to the Court." Thus, the court specifically considered defendant's rehabilitative efforts, including the fact that there was no record that defendant engaged in any additional criminal conduct while in prison.[5]

As to the other relevant factors defendant argues that the trial court did not take into account, including that the crime was related to a mental disorder (drug addiction) and defendant's age at the time of the prior strike conviction, defendant is correct that the trial court did not specifically mention these factors. However, the court considered defendant's "criminal history" and "all the individualized characteristics of … defendant." Moreover, defendant did not ask the trial court to consider these factors or object to the court's failure to specifically mention them. " 'A party in a criminal case may not, on appeal, raise "claims involving the trial court's failure to properly make or articulate its discretionary sentencing choices" if the party did not object to the sentence

---

[5]     We note that the trial court reduced defendant's sentence by six years based, in part, on defendant's progress in prison. Additionally, at the end of the hearing, the court "commend[ed]" defendant for the progress he had made.

11.

at trial. [Citation.] The rule applies to "cases in which the stated reasons allegedly do not apply to the particular case, and cases in which the court purportedly erred because it double counted a particular sentencing factor, misweighed the various factors, or failed to state any reasons or give a sufficient number of valid reasons .…" ' " (*People v. Scott* (2015) 61 Cal.4th 363, 406.) "Strong policy reasons support this rule: 'It is both unfair and inefficient to permit a claim of error on appeal that, if timely brought to the attention of the trial court, could have been easily corrected or avoided. [Citations.]' [Citation.] ' " ' "The law casts upon the party the duty of looking after his legal rights and of calling the judge's attention to any infringement of them. If any other rule were to obtain, the party would in most cases be careful to be silent as to his objections until it would be too late to obviate them, and the result would be that few judgments would stand the test of an appeal." ' " [Citation.]' " (*People v. Stowell* (2003) 31 Cal.4th 1107, 1114; accord, *People v. Salazar* (2016) 63 Cal.4th 214, 239–240; *People v. French* (2008) 43 Cal.4th 36, 46.) Thus, even if the trial court had failed to consider these factors, defendant forfeited this argument.

Moreover, defendant's reliance on *Avila* is misplaced. Unlike in *Avila*, *supra*, 57 Cal.App.5th at p. 1141, the trial court here considered the relevant factors. Moreover, in *Avila*, the trial court characterized the current crimes as violent even though they were not. (*Id*. at pp. 1142–1143.) In fact, the defendant in Avila "ha[d] not committed a violent felony since his strike offenses, showing that the severity of his record [was] decreasing." (*Id*. at p. 1143.) In contrast, the current crime in this case is murder, which is a violent felony. (§§ 667.5, subd. (c)(1), 667, subd. (d)(1).) Moreover, as the trial court reasonably found, it was a "horrific crime."

It is true that, based on the record in this case, defendant's behavior in prison since 2004 has been laudatory. However, given defendant's criminal history, including the horrific nature of the crime for which defendant was sentenced, we cannot find that the trial court abused its discretion in denying defendant's *Romero* motion. (*Carmony*, *supra*,

33 Cal.4th at p. 378 [" '[I]t is not enough to show that reasonable people might disagree about whether to strike one or more' prior conviction allegations. [Citation.] Where the record is silent [citation], or '[w]here the record demonstrates that the trial court balanced the relevant facts and reached an impartial decision in conformity with the spirit of the law, we shall affirm the trial court's ruling, even if we might have ruled differently in the first instance' "]; *People v. Mullins* (2018) 19 Cal.App.5th 594, 611 [We "give deference to the trial court's weighing of the relevant factors"].)

Defendant makes several other arguments, none of which are persuasive. Defendant argues that the "hyperpunitive policies" underlying the Three Strikes law are irreconcilable with current sentencing policy. It is not clear why defendant includes this argument. Defendant cites to no authority suggesting that the Three Strikes law is unconstitutional or otherwise invalid, nor does he ask us to find that it is. In fact, defendant asks us to "remand this matter back to the trial court to reconsider his *Romero* motion focusing more on current information and not just what was known 20 years ago." Moreover, even if we agreed with defendant's premise, we cannot invalidate or ignore the Three Strikes law on the ground that it is bad policy. (See, e.g., *Spier v. Baker* (1898) 120 Cal.370, 372; *Romero*, *supra*, 13 Cal.4th at p. 531.)

Finally, defendant argues that the trial court improperly applied section 1172.75 and California Rules of Court, rule 4.423(a). Defendant asserts that the court failed to consider two mitigating factors: "[t]he crime was committed because of an unusual circumstance, such as great provocation, that is unlikely to recur"; and "[t]he defendant, with no apparent predisposition to do so, was induced by others to participate in the crime." (Cal. Rules of Court, rule 4.423(a)(3), (5).) Defendant also asserts that the court did not conduct a full resentencing as required by section 1172.75, because "it is clear the court did not start from scratch."[6]

---

[6] Defendant also cites to section 1172.75, subdivision (d)(1). This section states, "[r]esentencing pursuant to this section shall result in a lesser sentence than the

13.

As to the mitigating factors, defendant did not argue below that these mitigating factors applied or object to the trial court's failure to consider them. Accordingly, defendant forfeited this argument for the same reasons he forfeited his argument that the court failed to take into account defendant's age at the time of the prior strike conviction and that the crime was related to a mental disorder. Moreover, even if his argument has not been forfeited, defendant does not point to any evidence in the record suggesting that an unusual circumstance (like great provocation) caused defendant to murder another inmate, or that defendant was induced by others to murder the inmate with no apparent predisposition to do so. Thus, it appears that the court did not take these mitigating factors into consideration because they do not apply.

As to the argument that the trial court failed to conduct a full resentencing as required by section 1172.75, defendant is incorrect. On December 15, 2023, when continuing the resentencing hearing, the trial court stated it needed "more time to prepare" because "[t]here's a lot of discretion [it] need[ed] to consider and exercise in performing a full resentencing." Then, at the hearing, it considered every aspect of defendant's sentence. While it declined to strike the prior strike conviction, it struck every other sentencing enhancement. Nothing in the record suggests that the court did not "start from scratch" or believed it was bound by any aspect of the prior sentence.

Based on the foregoing, defendant's arguments fail.

## DISPOSITION

The judgment is affirmed.

---

one originally imposed as a result of the elimination of the repealed enhancement, unless the court finds by clear and convincing evidence that imposing a lesser sentence would endanger public safety." (§ 1172.75, subd. (d)(1).) As the resentencing did result in a lesser sentence, the trial court was not required to find by clear and convincing evidence that imposing a lesser sentence would endanger public safety.

14.