Filed 6/29/26  P. v. Muasau CA1/4

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>ULUAO FRANK MUASAU,<br><br>    Defendant and Appellant. | A172591<br><br>(San Bernardino County<br>Super. Ct. No. FSB19003995) |

Uluao F. Muasau was sitting in his SUV when he got in a verbal altercation with a man outside of the vehicle.  Muasau got out of the SUV and fired 15 shots at the victim, killing him.  A jury found Muasau guilty of first degree murder.  Muasau contends the jury instructions inaccurately defined premeditation and that there is insubstantial evidence of deliberation and premeditation.  We affirm.

## I.    BACKGROUND

Muasau was charged with murder (Pen. Code,[1] § 187, subd. (a)) and possession of a firearm by a felon (§ 29800, subd. (a)(1)).  The operative information further alleged that, during the commission of the murder, Muasau personally used a firearm (§ 12022.5, subd. (a)) and personally and

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

intentionally discharged a firearm (§ 12022.53, subds. (b)–(d)). The charges were tried to a jury.

## A. The Prosecution's Case

The night of November 18, 2019, San Bernardino police detective, Jose Alvarez, was on patrol and heard gunshots. He was then dispatched to a report of a man down at a nearby intersection. There, he found Harold Osborne dead with a gunshot wound to the chest. Officer Alvarez saw Osborne's bicycle lay on the far side of the intersection.

While canvassing the scene, Officer Alvarez came upon and interviewed Kathleen Fitzwater. Fitzwater relayed that she saw a man traveling down the road on a bicycle and the man "started yelling at . . people" who were in a dark colored SUV. To her it sounded "like a fight," and then she heard "[a]bout 15" consecutive gunshots fired from the area where the SUV was. She observed men get back in the SUV and drive away.

Police interviewed Heather S., who lived in one of the apartments outside of which the shots were fired. Heather told the police that she was inside her apartment when she heard six or seven gunshots, prompting her to go outside. Once outside, she saw Muasau standing on the driver's side of an SUV, holding a gun in his hand and trying to turn off the SUV's headlights. Her boyfriend, Mark C., got out of the passenger side of the vehicle, grabbed Heather, and took her back inside the house.[2]

---

[2] At trial, however, Heather S. disavowed her prior statement that she went outside and saw Muasau with a gun, averring she felt pressured by the police to tell them what they wanted to hear. She testified that she saw Muasau's SUV pull up to the apartment via a security camera, which she then turned off. She also said that the gunshots woke her up yet, prior to the gunshots, she saw Osborne from her window and heard yelling, including Osborne yell, "Shut the fuck up." She further testified that Mark intercepted

2

Police found six expended nine-millimeter cartridge casings outside Heather and Mark's apartment. An autopsy determined Osborne died from a single gunshot wound to the chest. The lethal bullet was a nine-millimeter round. The shots were fired from the other side of a nine-foot tall chain link fence topped with barbed wire, which at least partially enclosed the apartment building's parking area.[3]

Police learned that Muasau owned a vehicle matching Fitzwater's description of the SUV that fled the scene. When police searched his SUV, they recovered nine expended nine-millimeter cartridge casings in the SUV's windshield wipers and hood. The headstamps of the cartridge casings matched those of the cartridge casings found at the scene by Heather and Mark's apartment. Laboratory analysis determined all 15 cartridge casings had been fired by the same gun.

When initially interviewed the day after the shooting, Muasau told the police that the prior night he went to Mark's house and stayed for about 15 minutes smoking marijuana before returning home. As he was leaving, Muasau claimed he saw a "fool" having a seizure in the street near a bicycle and drove past him. Muasau denied interacting with or shooting Osborne.

## B.    The Defense

Muasau's nephew, Ben, had been targeted in two shootings at about the same time as the Osborne shooting. Ben testified that, "[a]t that time in [his] life," he had been hanging out with the wrong crowd, including gang members.

---

her *inside* the apartment and therefore she never went outside or saw Muasau with a gun.

[3] Several bullets appeared to have struck the fence.

The first shooting occurred about a month prior to Osborne's killing. As Ben left a friend's house and got into a vehicle, a few other cars stopped and "a few shots rang out." Ben was struck in the hand, and his cousin and a friend were also shot. Subsequently, Ben started receiving threats on social media. About a week before Osborne's killing, one of messages threatened to kill Ben's dad—however, it included a photograph of Muasau. Ben informed Muasau of the threat. Ben testified that the social media threats were deleted by the sender.

The second shooting occurred hours before Osborne's killing. Ben, his mom, and his cousin were in a car outside their house when someone shot several times at them. No one was hurt, and they did not report the shooting.

Muasau testified that these two shootings made him concerned for his family and "a bit angry" at Ben "[b]ecause of the crowd he was hanging around." Muasau was "[w]orried" when he learned about the threat made against him on social media, but he did not become more vigilant and did not change how he went about his days.

Upon hearing about the second shooting, Muasau "got a little bit more worried" for his own safety. He went to Mark's house that night to "vent" and "tell him what was going on." Muasau said he sat outside Mark's house for about 15 minutes before Mark joined him to smoke marijuana and methamphetamine in his SUV.

Per Muasau, Mark pointed out Osborne and said that he thought Osborne had said Muasau's name, prompting Muasau to "[stick] [his] head out the window, and [Muasau] asked, like, what happened?" Osborne rejoined, "Shut the fuck up" and started walking towards the SUV with his bike. As he approached, Osborne dropped the bike about 83 yards away from

4

Muasau's SUV and said something to the effect of, "who wanna get gunned down, cuz?" A thought then "dawned on" Muasau that Osborne "possibly could be one of [the] guys" who shot at Ben. At some point during this exchange, Muasau turned on his SUV's headlights, but Muasau could only see Osborne's silhouette and could not make out his face or race. Yet Muasau could see that Osborne was walking towards him with his arm behind his back "as if he had a gun," yelling profanities.

Muasau testified that he believed Osborne was there to kill him. Muasau got out of his car and opened fire, shooting 15 times without pause. Muasau said he aimed high to "scare [Osborne] off" and he stopped shooting when Osborne "started running the other way." Muasau claimed he lied about how the shooting transpired to the police when they interviewed him because he was unaware that self-defense applied in California.

## C.    The Jury Instructions For First Degree Murder and Verdict

Following the close of evidence, the trial court instructed the jury. After stating the instructions for murder, the court explained to the jury that, if it found Muasau committed murder, "it was murder of the second degree, unless the [P]eople have proved beyond a reasonable doubt that it is murder of the first degree as defined in the next instruction, CALCRIM No. 521." As part of CALCRIM No. 521, the jury was instructed that first degree murder entailed an act committed "willfully, deliberately and with premeditation." The jury was further instructed that "[t]he defendant acted with premeditation if he decided to kill before completing the act that caused death."

The jury convicted Muasau of first-degree murder and of possession of a firearm by a felon, and the jury found all the alleged gun enhancements to be

true. The trial court sentenced Muasau to serve a term of 50 years to life in state prison.

## II. DISCUSSION

Muasau argues that we should reverse his conviction for first-degree murder because the jury instructions inaccurately defined premeditation and because there was insubstantial evidence of deliberation and premeditation. Each argument is meritless.

## A. The Jury Instructions Properly Defined Premeditation

The Attorney General asserts that Muasau's claim of instructional error was forfeited because defense counsel failed to object to the instruction at trial. However, "an appellate court may review any instruction, even when there was no objection or request for modification below, 'if the substantial rights of the defendant were affected thereby.' " (*People v. Johnson* (2016) 62 Cal.4th 600, 638.) Here, if Muasau were to prevail on his argument that CALCRIM No. 521's definition of premeditation allowed the jury to convict him of first degree murder based on merely a mental state of intent to kill, then that would have affected his substantial rights. (See *Johnson*, p. 639.) Accordingly, we reach the merits of his claim.

We review "the wording of a jury instruction de novo and assesses whether the instruction accurately states the law." (*People v. Mitchell* (2019) 7 Cal.5th 561, 579.) In doing so, we "must consider whether there is a reasonable likelihood that the trial court's instructions caused the jury to misapply the law in violation of the Constitution," viewing the challenged instruction " 'in the context of the instructions as a whole and the trial record to determine whether there is a reasonable likelihood the jury applied the instruction in an impermissible manner.' " (*Ibid.*)

In arguing that jury instruction CALCRIM No. 521 inaccurately defines premeditation, Muasau specifically takes issue with the sentence in the instruction stating, " '[t]he defendant acted with premeditation if he decided to kill before completing the act that caused death.' " He contends that "[d]efining premeditation as a decision to kill before completing the acts that caused death is tantamount to merely requiring that the defendant killed intentionally." We disagree.

As our Supreme Court has succinctly stated many times, " '[i]n the context of first degree murder, " 'premeditated' means 'considered beforehand.' " ' " (*People v. Salazar* (2016) 63 Cal.4th 214, 245 (*Salazar*) *holding modified on another ground by People v. Hardin* (2024) 15 Cal.5th 834; *People v. Houston* (2012) 54 Cal.4th 1186, 1216 [same]; *People v. Jennings* (2010) 50 Cal.4th 616, 645 [same]; *People v. Halvorsen* (2007) 42 Cal.4th 379, 419 [" ' "premeditation" means thought over in advance' "].) According to Merriam-Webster, the primary definition of "decide" is: "To make a final choice or judgment about." (Merriam-Webster Dict. (June 2026) https://www.merriam-webster.com/dictionary/decide. [as of Jun. 29, 2026]). Similarly, the primary definition of "decide" in the Oxford English Dictionary is: "To arrive at an opinion or conclusion about (a matter under consideration); to make a decision regarding (question, issue, etc., on which there is doubt or dispute), esp. after considering several alternatives." (Oxford English Dict. (September 2025) https://doi.org/10.1093/OED/2027886117 [as of Jun. 29, 2026].) Thus, CALCRIM No. 521's language stating that "[t]he defendant acted with premeditation if he *decided* to kill before completing the act that caused death" is consistent with the Supreme Court's definition of premeditation and requires more than an intent to kill. (Italics added.)

Muasau's argument that to be premeditated "a killing must be pursuant to a 'preconceived design' " or entail "planning, plotting, or scheming" is unavailing. A preconceived design or plan may be sufficient to prove premeditation, but Muasau's proposed definition is too narrow a prescription of "premeditation" because a " ' " 'cold, calculated judgment may be arrived at quickly.' " ' " (*Salazar*, *supra*, 63 Cal.4th at p. 245.) Muasau's argument was definitively refuted in *People v. Anderson* (1968) 70 Cal.2d 15, where our Supreme Court "observed that premeditation and deliberation may be proved by evidence of planning activity, motive, and manner of killing, *or any other evidence* supporting ' " ' "an inference that the killing occurred as the result of preexisting reflection rather than unconsidered or rash impulse.' " ' " (*People v. Alvarez* (2025) 18 Cal.5th 387, 470, italics added.)

Moreover, we must read each instruction in totality and in the context of the instructions as a whole. (*People v. Mitchell*, *supra*, 7 Cal.5th at p. 579.) Here, there is no reasonable likelihood that the jury would misapprehend premeditation considering (1) the full text of CALCRIM No. 521, and (2) the entire context of the instructions.

The trial court read CALCRIM No. 521 verbatim, stating: "The defendant is guilty of first-degree murder if the People have proved that he acted willfully, deliberately and with premeditation. The defendant acted willfully if he intended to kill. The defendant acted deliberately if he carefully weighed the considerations for and against his choice and, knowing the consequences, decided to kill. The defendant acted with premeditation if he decided to kill before completing the act that caused death.

"The length of time the person spends considering whether to kill does not alone determine whether the killing is deliberate and premeditated. The amount of time required for deliberation and premeditation may vary from

8

person to person and according to the circumstances. The decision to kill made rashly, impulsively or without careful consideration is not deliberate and premeditated. On the other hand, a cold, calculated decision to kill can be reached quickly. The test is the extent of the reflection, not the length of time.

"If you find that the defendant committed murder as defined in the previous instruction, CALCRIM 520, you must decide whether the murder was of the first or second degree. The People have the burden of proving beyond a reasonable doubt that the murder was first-degree rather than second-degree murder. If the People have not met this burden, the defendant is not guilty of first-degree murder and the murder is second-degree murder."

In view of CALCRIM No. 521 as a whole, we perceive no reasonable likelihood that the jury misapprehended or misapplied "premeditation." Not only did the instruction properly state that "[t]he defendant acted with premeditation if he decided to kill before completing the act that caused death," it provided the contrast that a "decision to kill made rashly, impulsively or without careful consideration is not deliberate and premeditated." The instruction emphasized that "[t]he test is the extent of the reflection" and required "a cold, calculated decision" regardless of how long it took the defendant to reach the decision. There is no basis to abandon the presumption that the jurors understood, correlated, and duly followed the court's instructions. (*People v. Dejesus-Galindo* (2025) 113 Cal.App.5th 692, 701.)

Moreover, the jury was instructed that it must not conflate the mental states of first degree murder—i.e., acting willfully, deliberately, and with premeditation—and second degree murder—i.e., acting with malice aforethought. Specifically, the jury was instructed that "[t]he People must

9

prove not only that the defendant did the acts charged but also that he acted with a particular intent and/or mental state" and that "[t]he instruction for each crime and allegation explains the intent and/or mental state required." Later, the jury was told that Muasau was charged with first degree murder, which included, inter alia, the lesser offense of second degree murder. The court reiterated that to be guilty of either first degree murder or second degree murder, Muasau had to commit the prohibited act "with a specific intent and/or mental state" which the court would "explain[] in the instruction for [each] crime or allegation."

Turning to the murder charge, the trial court instructed the jury that Muasau was guilty of murder if it found that he committed an act that caused Osborne's death and, "when [Muasau] acted, he had a state of mind called malice aforethought." The court defined express malice—an unlawful intent to kill—and implied malice—committing an intentional act knowing that the natural and probable consequences of the act are dangerous to human life and acting with conscious disregard of human life. To reach a guilty verdict on the charge, the court further instructed the jury that Muasau needed to have formed the mental state of malice aforethought "before the act that cause[d] death [was] committed." Following the murder instructions, the court informed the jury that if it found Muasau committed murder then it was of the second degree, "unless the [P]eople have proved beyond a reasonable doubt that it is murder of the first degree as defined in the next instruction, CALCRIM No. 521."

Again, we presume the jury understood, correlated, and duly followed the court's instructions. Muasau's conjecture that the jury may have applied the standard of malice aforethought—i.e., forming an intent to kill before the act that caused the death—when considering the first degree murder charge

10

is unsupported by any evidence. Instead, the juxtaposition of the second degree murder instructions and CALCRIM No. 521 instills confidence that the jury properly understood and applied the instructions. (See e.g., *People v. Jones* (2014) 223 Cal.App.4th 995, 1001 [holding "CALCRIM Nos. 521 and 522, taken together" properly instructed the jury on the provocation doctrine as a basis for second degree murder].)

## B.    The Jury Verdict Is Supported By Substantial Evidence

Muasau contends that the record lacks substantial evidence from which a rational juror could conclude beyond reasonable doubt that he premeditated and deliberated his killing of Osborne. Although the evidence is not overwhelming, it is sufficient to sustain the jury's finding.

" 'To determine the sufficiency of the evidence to support a conviction, an appellate court reviews the entire record in the light most favorable to the prosecution to determine whether it contains evidence that is reasonable, credible, and of solid value, from which a rational trier of fact could find the defendant guilty beyond a reasonable doubt.' " (*People v. Jurado* (2006) 38 Cal.4th 72, 118.) "[T]he relevant question on appeal is not whether *we* are convinced beyond a reasonable doubt, but whether *any* rational trier of fact could have been persuaded beyond a reasonable doubt that defendant premeditated the murder." (*People v. Perez* (1992) 2 Cal.4th 1117, 1127 (*Perez*).) This means that even where a reasonable jury could have found the evidence did not support premeditation and deliberation and returned a verdict of second degree murder, a conviction for first degree murder must stand " ' "[i]f the circumstances reasonably justify the jury's findings." ' " (*Salazar*, *supra*, 63 Cal.4th at p. 245.) " ' "[T]he reviewing court may not reverse the judgment merely because it believes that the circumstances might also support a contrary finding." ' " (*Ibid.*)

11

According to Muasau, he was inside his SUV when Mark alerted him to Osborne's presence. Osbourne met Muasau's question of "what happened" with hostile profanity and began walking towards the SUV. In Muasau's view, Osborne escalated events by dropping his bike, making movements suggesting he had a gun, and saying, "who wanna get gunned down, cuz?" Muasau admitted that he thought Osborne "possibly" was involved in the shootings of his nephew Ben. Muasau stated that he turned on his headlights to light the area up, exited his vehicle, and fired in Osborne's direction until Osborne ran away.

Muasau's account establishes that the events unfolded at a pace that would allow someone to form and reflect on a cold, calculated decision to kill. Critically, Muasau expressly stated that he thought Osborne was potentially targeting him, and—after having that thought—Muasau took steps that support the inference that he thought of, and reflected on, killing Osborne before proceeding to do so. Specifically, Muasau illuminated Osborne, exited his vehicle, drew his firearm, and aimed at the silhouetted figure nearly 250 feet away. (See *People v. Nelson* (2011) 51 Cal.4th 198, 213 [affirming jury finding of premeditation and deliberation to commit attempted murder because defendant "took up a firearm, climbed out of a moving car, sat on the window frame, reached across the roof, braced himself, and aimed at Doe"].) On this record, a rational juror could reasonably conclude that Muasau's killing of Osborne was the result of preexisting thought and the careful weighing of considerations.

Muasau maintains that there is no evidence in support of the factors courts generally rely on to determine premeditation and deliberation: (1) planning activity, (2) motive, and (3) manner of killing (the *Anderson* factors). (See *People v. Anderson, supra,* 70 Cal.2d at p. 26–27.) But as noted

12

above, "[t]he *Anderson* factors, while helpful for purposes of review, are not a sine qua non to finding first degree premeditated murder, nor are they exclusive." (*Perez*, *supra*, 2 Cal.4th at p. 1125.) They merely confirm that premeditation and deliberation may be shown by a variety of different types of circumstantial evidence. Moreover, in view of the judicial gloss applied to the *Anderson* factors, there is evidence of planning activity and motive sufficient to prove premeditation and deliberation.

To prove first degree murder, "[t]he law does not require that an action be planned for any great period of time in advance." (*People v. Rand* (1995) 37 Cal.App.4th 999, 1001.) Plus, it is well established that carrying a loaded gun is circumstantial evidence from which a jury may infer preparation and planning for involvement in a violent encounter. (*People v. Lee* (2011) 51 Cal.4th 620, 636; *Salazar*, *supra*, 63 Cal.4th at p. 245.) A motive to kill may also be reasonably inferred from evidence that the defendant perceived his victim to be a threat or aggressor, even if the victim is a stranger. (*People v. Cardenas* (2020) 53 Cal.App.5th 102, 122 (*Cardenas*).)

*Cardenas*, which "involve[d] a brief encounter between two groups of strangers . . . in which quickly escalating tensions resulted in a shooting," is on point. (*Cardenas*, *supra*, 53 Cal.App.5th at p. 106.) There, Cardenas's companion, Luis, instigated a verbal altercation with a group of strangers in a parking lot. (*Id.* at p. 108.) The group advanced toward Cardenas and Luis, and the man at the front of the group (Armando) "raised his arms outward and held his palms open" in " 'fighting form.' " (*Id.* at p. 108.) Cardenas pulled a gun out, causing all the men except Armando to retreat. (*Id.* at pp. 108–109.) Believing Armando might be armed, Cardenas shot Armando; Luis also fired a shot at Armando, and Cardenas fired at Armando a second time. (*Id.* at p. 109.) Cardenas and Luis continued to shoot in the

group's direction as they fled the scene. (*Id.* at pp. 109–110.) "The entire incident—from the initial encounter to Cardenas's and Luis's flight from the scene—lasted 30 seconds. Less than 10 seconds transpired between the first shot and Luis's departure from the parking lot." (*Id.* at p. 109.)

According to Cardenas, "[h]e brought the gun with him 'just in case' because he and Luis had been involved in a shooting in the same parking lot two weeks earlier." (*Cardenas, supra,* 53 Cal.App.5th at p. 110.) The court of appeal held that "[r]egardless of how Cardenas justified arming himself, the act of taking a loaded weapon with him to the restaurant is evidence of preparation and planning for involvement in a violent encounter." (*Id.* at p. 122.) The court also held there was evidence that Cardenas had a motive to kill one of the other men he shot, Chris, because Chris had stood close to Armando during the verbal confrontation and initially advanced toward Cardenas with Armando. (*Ibid.*) The court explained, "[a] reasonable jury could infer from that evidence that Cardenas had a motive to kill Chris because [Cardenas] perceived Chris as one of the main aggressors from Armando's group." (*Ibid.*) Considering the totality of evidence, the court concluded that "a jury could reasonably infer that the attempted murder of Chris was the result of thoughtful consideration and not the result of an unconsidered spontaneous act." (*Ibid.*)

The instant case presents even greater evidence of planning than that in *Cardenas.* Muasau testified that he went to Mark's house to "vent" about the shootings that targeted his nephew. Coupled with his testimony that he was angry and worried but no more vigilant than normal in the wake of the shootings targeting Ben, Muasau's decision to carry an operable and loaded gun supports an inference that he was not merely prepared to defend himself but planned to violently confront someone. A rational juror could further

14

infer that Muasau acted on this plan when it occurred to him that Osborne may be a gang member who shot at his nephew. The fact that it was "happenstance" that Osborne and Muasau crossed paths on that tragic night does not negate an inference that Muasau planned to kill Osborne nor demonstrate that the killing was impulsive. (See *Perez, supra*, 2 Cal.4th at p. 1127 ["premeditation can occur in a brief period of time" as " '[t]houghts may follow each other with great rapidity and cold, calculated judgment may be arrived at quickly . . . .' "].)

Similarly, the instant case presents at least as much evidence of motive as existed in *Cardenas*. Not only did Osborne advance toward Muasau in a potentially threatening manner, like the victims in *Cardenas*, but Osborne allegedly used a term that caused Muasau to believe Osborne was gang affiliated. Again, coupled with his testimony that he was "angry" at his nephew *because* his nephew hung out with gang members, Muasau's belief that Osborne was potentially such a gang member is evidence from which a rational juror could infer Muasau had a motive to kill Osborne.

Muasau's reliance on *People v. Wear* (2020) 44 Cal.App.5th 1007 is misplaced. There, the defendant, Wear, arranged to meet an acquaintance, Rossknecht, to either buy or steal a gun. (*Id.* at p. 1009.) Wear went to the meeting unarmed. (*Ibid.*) An argument arose during the meeting, and the Rossknecht shot and fatally wounded Wear's friend. (*Ibid.*) "Wear then seized that gun, shot Rossknecht twice with it, and fled with the other gun." (*Id.* at pp. 1009–1010.) On appeal, the court held the evidence demonstrated that Wear killed Rossknecht impulsively, "shooting Rossknecht with Rossknecht's own gun only after Rossknecht shot [Wear's friend] in the course of an argument." (*Id.* at p. 1031.)

Muasau claims that the manner of killing does not suggest premeditation or deliberation. Although a method of killing need not be "execution style" to support of inference of premeditation and deliberation, firing multiple rounds with a handgun at a distant target in the dark on the other side of a fence does not evince a "deliberate manner."[4] (Cf. *People v. Poindexter* (2006) 144 Cal.App.4th 572, 588 ["The manner of killing, while not an execution-style single shot to the head, could still support a finding of premeditation and deliberation, as defendant quickly fired three shots at the victim, with a shotgun, from a relatively close range"].) But this missing ingredient is not enough to reverse the jury's verdict. (*People v. Perez, supra,* 2 Cal.4th at p. 1125 [courts sustain verdicts when there is extremely strong evidence of planning activity or evidence of motive in conjunction with either planning activity or a deliberate manner of killing].) Similarly, because the aforementioned evidence is sufficient to sustain the verdict, we need not consider Muasau's argument that his post-shooting actions tend to show the shooting was an unconsidered, rash act.

### III. DISPOSITION

The judgment is affirmed.

---

[4] We do not resolve that a killer's act of firing multiple times at a distant target cannot evidence or necessarily refutes an inference of premeditation and deliberation. Rather, we merely find the present circumstances do not support such an inference.

_____

Sweet, J.\*


WE CONCUR:


_____

Streeter, Acting P. J.


_____

Goldman, J.


A172591/*People v. Muasau*

---

\* Judge of the Superior Court of California, County of Marin, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

17